**AMERICAN DERRINGER CORPORATION,**
Appellant,

v.

**Greg BOND, Individually and d/b/a Texas Arms, Appellee.**

No. 10–95–263–CV.

Court of Appeals of Texas,
Waco.

June 19, 1996.

Greg White, McGregor & White, Pat Beard, Beard & Kultgen, Waco, for appellant.

Gerald L. Bolfing & Andy E. McSwain, Fulbright, Winniford, Bice and Marable, Waco, for appellee.

Before CUMMINGS and VANCE, JJ., and McDONALD, C.J. (Retired).

## OPINION

VANCE, Justice.

This appeal involves trade secrets and malicious prosecution. We find "no-evidence" to support a finding that a company did not have probable cause to institute proceedings to enjoin a former employee from selling a competing product. We reverse the judgment for the employee on his malicious prosecution claim and render judgment for the employer.

In August of 1991, American Derringer Corporation (ADC) hired Greg Bond, an engineer who was also a gun collector but who had never before worked for a gun manufacturer. As its name implies, ADC manufactures · derringer-type handguns. Bond worked for ADC for almost a year before he was fired. Shortly afterwards, ADC learned that Bond's company, "Texas Arms," intended to market a gun similar to one of its

products and sued him for misappropriation of trade secrets. The court issued an ex parte temporary restraining order prohibiting Bond from "manufacturing, marketing, soliciting or offering for sale, advertising, promoting, or otherwise displaying a Derringer styled pistol" with certain enumerated features. Bond immediately filed an answer and a motion to dissolve the restraining order. The court dissolved the restraining order three days after its issuance. Bond then filed a counterclaim for malicious prosecution.

A jury found: (1) Bond did not convert any of ADC's trade secrets; (2) ADC lacked probable cause to bring the suit and obtain the injunctive relief; (3) ADC acted with malice; and (4) Bond sustained $131,500 in actual damages. Judgment for Bond was entered on the verdict.

ADC presents six points of error complaining of (1) the legal and factual sufficiency of the evidence to support the jury's finding that ADC lacked probable cause to pursue its claim against Bond, (2) an erroneous award of damages for the diminished value of Bond's business, (3) the legal and factual sufficiency of the evidence to support the jury's award of damages for mental anguish, (4) two instances of error in the charge, and (5) the award of attorney's fees. In a cross-point, Bond asserts that the court erred in refusing to submit jury questions concerning his claim that ADC was in violation of the Texas Antitrust Act. Tex.Bus. & Com.Code Ann. §§ 15.01–.52 (Vernon 1987 & Supp. 1996).

## TRADE SECRETS

Before we address the points of error, we briefly discuss the law governing trade secrets as it relates to this case. We do so because that is the theory upon which ADC sought and received the injunctive relief which, in turn, became the basis for Bond's counterclaim for malicious prosecution. We stress at the outset that we do not question the jury's finding that Bond had not misappropriated ADC's information—a finding that has not been attacked. Our inquiry is limited to whether the jury was justified in finding that ADC had no probable cause to believe that Bond had violated the confidential relationship and wrongfully exploited its trade secrets.

TRADE SECRETS GENERALLY

ADC's suit was brought on the theory that Bond had misappropriated information used by ADC in the design, manufacture, and marketing of its products. This cause of action was described in section 757 of the original Restatement of Torts:

> One who discloses or uses another's trade secrets, without a privilege to do so, is liable to the other if (a) he discovers the secret by improper means, or (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him....

Restatement of Torts § 757 (1939).[1]

■■■ A "trade secret" may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex.1996). Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, 776 (on rehearing) (quoting Restatement of Torts § 757), *cert. denied*, 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958). "A trade secret may be a device or process which is patentable; but it need not be that. It may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement that a good mechanic can make. Novelty and invention are

1. The sections dealing with trade secrets were omitted from the Restatement of Torts (Second) but have reemerged in Chapter Four, "Appropriation of Trade Values," in the Restatement (Third) of Unfair Competition. Restatement (Third) of Unfair Competition §§ 39–45 (1995). This version was not adopted by the American Law Institute until May 11, 1993. Thus, we look to the state of the law as of the time Bond left ADC's employ and find that Texas courts have generally followed the principles of the original Restatement. *See e.g., Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex.1996).

not requisite for a trade secret as they are for patentability." *K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.,* 158 Tex. 594, 314 S.W.2d 782, 789 (1958) (quoting RESTATEMENT OF TORTS § 757). The mere fact that knowledge of a product might be acquired through lawful means such as inspection, experimentation, and analysis does not preclude protection from those who would secure that knowledge by unfair means. *See id.* 314 S.W.2d at 788. "The question is not, 'How could he have secured the knowledge?' but 'How did he?'" *American Precision Vibrator Co. v. National Air Vibrator Co.,* 764 S.W.2d 274, 277 (Tex.App.—Houston [1st Dist.] 1988, no writ) (citing *Brown v. Fowler,* 316 S.W.2d 111, 114 (Tex.Civ.App.—Fort Worth 1958, writ ref'd n.r.e.)).

DUTY OF AN EMPLOYEE

■ Upon the formation of an employment relationship, certain duties arise apart from any written contract. *Miller Paper Co. v. Roberts Paper Co.,* 901 S.W.2d 593, 600 (Tex.App.—Amarillo 1995, no writ). One of those duties forbids an employee from using confidential or proprietary information acquired during the relationship in a manner adverse to the employer. *Id.*; *Numed, Inc. v. McNutt,* 724 S.W.2d 432, 434 (Tex.App.—Fort Worth 1987, no writ). This obligation survives termination of employment. *Miller Paper,* 901 S.W.2d at 600; *Auto Wax Co., Inc. v. Byrd,* 599 S.W.2d 110, 111 (Tex.Civ.App.—Dallas 1980, no writ). Although this duty does not bar use of general knowledge, skill, and experience, it prevents the former employee's use of confidential information or trade secrets acquired during the course of employment. *Miller Paper,* 901 S.W.2d at 600–01; *American Precision,* 764 S.W.2d at 278. "In Texas, courts condemn the employment of improper means to procure trade secrets." *American Precision,* 764 S.W.2d at 277.

■ When a claim of improper disclosure or use of trade secrets arises from a confidential relationship, such as between an employer and an employee, the injured party is not required to rely upon an express agreement that the offending party will hold the trade secret in confidence. *See Hyde Corp.,* 314 S.W.2d at 770 (quoting the Restatement of Torts); *Gonzales v. Zamora,* 791 S.W.2d 258, 265 (Tex.App.—Corpus Christi 1990, no writ). Likewise, the absence of an ulterior or improper motive in entering into the relationship will not preclude relief for an injured party. *See Hyde Corp.,* 314 S.W.2d at 770. "The gravamen of [such a complaint] is breach of confidence." *Id.* The question is: Has the offending party abused the trust that was reposed in him incident to a confidential relationship with the injured party? *See id.* (quoting from *E.I. DuPont De Nemours Powder Co. v. Masland,* 244 U.S. 100, 102, 37 S.Ct. 575, 576, 61 L.Ed. 1016 (1917)).

■ The employer must show that the information was, in fact, a trade secret.[2] *American Precision,* 764 S.W.2d at 279 (citing *Hallmark Personnel of Texas, Inc. v. Franks,* 562 S.W.2d 933, 936 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ)). Items such as customer lists, pricing information, client information, customer preferences, buyer contacts, market strategies, blueprints, and drawings have been shown to be trade secrets. *See, e.g., Miller Paper,* 901 S.W.2d at 601 (affirming temporary injunction against former employees restricting use of confidential information); *American Precision,* 764 S.W.2d at 278 (evidence factually sufficient to support finding that items were trade secrets).

---

2. One court of appeals has said that the factors to be considered in determining whether given information is a trade secret include: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Expo Chem. Co., Inc. v. Brooks,* 572 S.W.2d 8, 11 (Tex.Civ.App.—Houston [1st Dist.] 1978) (citing *Town and Country House and Homes Service, Inc. v. Evans,* 150 Conn. 314, 189 A.2d 390 (1963)), *rev'd,* 576 S.W.2d 369 (Tex.1979) (court of appeals prematurely reviewed merits of suit after denial of temporary injunction).

■ The protection of a trade secret is a well-recognized objective of equity. *K & G Oil Tool*, 314 S.W.2d at 790 (injunctive relief upheld after design of an oil field tool was obtained by a licensee in violation of an express agreement not to disassemble the tool); *Hyde Corp.*, 314 S.W.2d at 770 (trade secrets, distinguished from patents, subject to protection under the equitable jurisdiction of state courts).

SUMMARY

■ In a 1987 Texas Bar Journal article, we find this summary:

> Under Texas law, a person is liable for the disclosure of trade secrets if he discovers the secret by improper means or his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him. *Mercer v. C.A. Roberts Co.*, 570 F.2d 1232, 1238 (5th Cir. 1978); *Hyde Corp.*, 314 S.W.2d at 769. Injunctive relief may be granted when an employee breaches his confidential relationship with his employer in order to unfairly use a trade secret, and the employer is not required to rely upon an express agreement to hold such trade secrets in confidence.

Marcia A. Crone, *The Departing Employee—Prevention of Competition and Protection of Trade Secrets*, 50 Tex.B.J. 372, 374 (1987). And, "[a] former employee is free, however, to use in later employment the general skills, knowledge, and experience which he has acquired, even if the former employment has acted to increase his skills and if such training is complex and extensive." *Id.* at 375. The article also discusses the "commonly accepted definition" of a trade secret, as "found in the Restatement of Torts § 757 (1939)." *Id.* at 374. Finally, the article states: "There are several remedies available to protect ... trade secrets. Often, the first remedy sought by an employer is a temporary restraining order, followed by a temporary

and then a permanent injunction. [citations omitted] This remedy accomplishes the employer's goal of obtaining immediate cessation of the employee's violative conduct under threat of the court's exercising its powers of contempt." *Id.* at 376.

Having visited the law of trade secrets and the duties of employees, we turn to the law regulating suits for malicious prosecution.

## MALICIOUS PROSECUTION

■ A person who obtains an injunction wrongfully is liable for damages caused by issuance of the injunction. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 685 (Tex. 1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991). There are two separate causes of action for wrongful injunction: one upon the bond ordinarily filed to obtain the issuance of the injunction; another for malicious prosecution. *Id.* Here, Bond chose to file the latter as a counterclaim in the same proceeding in which the injunction was issued.

■ A malicious prosecution claim may arise out of a prior criminal proceeding or a prior civil proceeding, the former being far more prevalent. To prevail in a suit alleging malicious prosecution of a prior civil claim, the plaintiff must establish: (1) the institution or continuation of civil proceedings against the plaintiff; (2) by or at the insistence of the defendant; (3) malice in the commencement of the proceeding; (4) lack of probable cause for the proceeding; (5) termination of the proceeding in plaintiff's favor; and (6) special damage. *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 207 (Tex.1996) (citing *James v. Brown*, 637 S.W.2d 914, 918 (Tex.1982)).[3] One accused of malicious prosecution is rightly aided by "an initial presumption that a defendant acted reasonably and in good faith and therefore had probable cause." *Ellis County State Bank v. Keever*, 888 S.W.2d 790, 794 (Tex.1994) (malicious

**3.** A plaintiff against whom criminal proceedings were instituted is required to establish seven facts to prove malicious prosecution: (1) the commencement of a criminal prosecution against the plaintiff; (2) that the prosecution was caused by the defendant or through its aid or cooperation; (3) that the prosecution terminated in favor of the plaintiff; (4) that the plaintiff was innocent; (5) that there was no probable cause for the proceeding; (6) that the defendant acted with malice; and (7) damages. *Metzger v. Sebek*, 892 S.W.2d 20, 41–42 (Tex.App.—Houston [1st Dist.] 1994, writ denied).

prosecution suit after an unsuccessful criminal prosecution) (quoting *Akin v. Dahl*, 661 S.W.2d 917, 920 (Tex.1983), *cert. denied*, 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984), a malicious prosecution suit following an unsuccessful application for temporary guardianship due to mental incompetency).

## THE EVIDENCE

### A.

Trial was held in May of 1995. ADC presented four witnesses: Elizabeth Saunders, president of ADC; Dwight L. Edwards, the head machinist for ADC; Roberta Geer, a customer of ADC; and Steven Eskridge, an expert witness.

ELIZABETH SAUNDERS

Elizabeth Saunders testified that she was the president of ADC, having succeeded her husband, Robert Saunders (Bob), when he died in 1993. She said that ADC's customers fall into one of three categories: distributors who purchase one hundred or more guns within a twelve month period, jobbers who purchase five or more guns, and individuals who buy just one gun. Distributors and jobbers are required to hold a federal firearms license. She described the various models of the guns that ADC manufactured. Two-thirds of all guns sold by ADC were "Model 1" derringers, about 40,000 of which had been manufactured since 1988.

Part of her duties with ADC involved the handling of customer complaints and comments about the product. These communications were directed, first, to Bob Saunders, then to the appropriate department within the company. They were considered confidential. A large number of complaints about the Model 1 had been made to the company, many about safety aspects of the gun. Elizabeth said that the company "had several lawsuits pending because of that."

Elizabeth explained her understanding of the "casting" process, by which a foundry makes the barrels and other components of the guns that are to be manufactured. This involves drawings, models, tolerances, acceptances, a mold for each component, and inspections and x-rays of the finished components. She said that ADC retained ownership of all of the molds that the foundry used to make the components and that they are kept "locked up."

Prior to 1991, the company had no plant manager or engineer among its employees. Bob Saunders, who had acquired the ability to design and manufacture guns "on the job," performed those functions. In 1991, because of the safety complaints, the company sought an engineer to work on those and other problems. ADC hired Bond to "find out what the problems were." During the first six or seven months, Bond set up a "gun drill," a machine designed to drill a hole with the perfection needed to make a gun barrel. When the gun drill was "up and running," it helped increase production. He also created a "flow chart" to track the process of assembling guns. Elizabeth said that Bond was acting as the plant manager and had access to everything that ADC had, including all drawings developed for the company for the manufacture of its guns. He also worked with companies that produced the components for ADC and had full access to complaints and comments made by customers about the products.

Elizabeth said that various employees of the company discussed solutions to the safety problems, such as "a retractable firing pin," "a rebounding hammer," and "a cross-bolt safety," in Bond's presence. Cosmetic changes, such as "an octagonal barrel," which the company wanted to offer as a customer option, were also discussed with him.

In July of 1992, Bob Saunders fired Bond because of a disagreement over allowing employees time-off.

In January of 1993, Bob Saunders learned that Bond was displaying "a gun that looked similar to ours" at a "Shot Show," a large trade show for the firearms industry. Elizabeth said she was surprised that Bond was offering a similar weapon only six months after he had been fired. Because Bob Saunders was sick and later died, nothing was done with the information until just before the 1994 Shot Show. A few weeks before that show, ADC sought legal counsel because Elizabeth "felt [Bond] used the knowledge of American Derringer to be able to produce

the gun in the time he did, and also putting the [retractable firing pins, the rebounding hammer, and the cross-bolt safety] on the guns that we had spoke about previously in the past when he was hired there." ADC obtained Bond's literature describing his gun as the "Defender." She said that some of the features that the Defender's brochure described were features that ADC had sought to get Bond to produce for its guns.

Elizabeth said that she had seen Bond "doing a lot of drawing" while employed at the company. She further said that the frame of the Defender "looked a lot like our frame"; that the Defender was offered with interchangeable barrels which ADC had offered in the past; that "the calibers he was offering it in was similar to our calibers"; and that "he incorporated all the things that—on this gun that we had basically discussed while he was employed . . . that needed to be on for safety purposes." When the directory for the 1994 Shot Show came out and she knew that Bond was going to be there, Elizabeth made the decision on behalf of ADC to take legal action.

On cross-examination, Elizabeth said that the Model 1 did not have a cross-bolt safety but had a "hammer block safety system." She described warnings in ADC's brochures about some of the safety problems she had described and acknowledged that Bob Saunders discussed some safety problems with Bond before he was hired. Bond also introduced through her testimony a "parts list" provided by ADC with several models of guns, showing an "exploded view" of a typical weapon and listing the parts generally used.[4] Elizabeth said that other companies who manufacture guns may also use the same casting method as ADC and identified a Waco newspaper article written about ADC that identified the process.

Elizabeth said that one of her larger distributors, Ammunition Consulting Services (ACS), told her that Bond was soliciting ADC's customers and sent her literature describing the Defender. ACS also sent ADC copies of (1) an invoice it had received from

"Texas Arms" dated February 3, 1993, for one gun and (2) a letter dated August 25, 1993, on Texas Arms letterhead, signed by Bond, explaining "start-up delays." She did not, however, know of any other customer of ADC's that Bond had solicited.

Elizabeth said that she did not know Bond's background before coming to ADC, other than that he was "a mechanical engineer," and that she did not review his personnel file before taking legal action against him. She said that he was hired to do design work and serve as the plant manager, making sure that production went smoothly and that the employees performed their assigned tasks. She acknowledged that ADC's production increased after Bond arrived, but said that by the summer of 1992, "we weren't getting any guns out the door." ADC did not hire another engineer until almost two years after Bond left.

On redirect examination, Elizabeth said that a review of Bond's personnel file showed he was experienced as a journeyman tool and die maker and that, with the confidential information he had learned at ADC, should have no trouble in producing a gun.

### DWIGHT L. EDWARDS

Dwight Edwards, known as "Ikey," was the shop foreman at ADC for eight years prior to trial. He had been a machinist for nineteen years. He described the type of work he did for ADC, including the solving of some design problems.

Edwards said he had seen Bond doing drawings. He said that Bond was not at ADC when they worked on the octagonal barrel. The rebounding-hammer work was done seven or eight months after Bond left, although another employee told him that Bond had discussed it. Edwards said he had discussed the cross-bolt safety, which "goes hand in hand with the rebounding hammer," with Bond. He said that, before Bond was fired, Bond told him that he and his brother wanted to start a competing company "because they wanted to, you know, put [ADC] out of business."

4. The exhibit states: "Please note: This is a General Parts List for the derringer. This gun has been manufactured in 10 models and 60 calibers. All of these parts are not found in every gun and some guns may have parts which are not listed."

On cross-examination, Edwards said that Bond was hired to be the plant manager, to design and build tools, and to increase and improve production. He agreed that production had increased. He said Bond made some modifications on the firing pin holes, the firing pins, and the "recoil plates," mostly on the Model 1. He examined the Defender and said that it had an "automatic extractor" which most of ADC's models did not have. He agreed it would not take a significant amount of work to add that feature. He said he created an octagonal barrel for a Model 1 in about twenty minutes, right before the 1994 Shot Show. He had no knowledge of Bond's taking anything from ADC nor of his contacting customers or suppliers. He said Bond never discussed the "rebounding hammer" feature with him. Edwards said that the Defender "to me is a mixture of a Model 1 and your DA's."[5]

Edwards said Bond was fired during an employees' meeting—that Bob Saunders "just kind of stopped abruptly, turned to Greg Bond, and said You're fired." During that meeting, Bob also discussed the fact that research and development were not being done.

ROBERTA GEER

Roberta Geer testified that she met the Saunders at the 1991 Shot Show in Dallas. She first learned of Texas Arms, Bond's company, at the 1993 Shot Show. She said that when she first saw the Defender, "it looked very much like American Derringer's." Later, she said it was "a clone, a knock-off, an outright copy, whatever you want to use." Geer said that she dealt mostly in "little derringers" for their company, Ammunition Consulting Services, while her husband, Dick, dealt with ammunition and collectibles. She had over 700 pistols "in the house or in the business, fooled with, have shot or had something to do with." She said ADC makes an "excellent product" with a few problems.

Geer said the Defender she saw at trial looked like the one she had originally seen in 1993, except that it did not have a trigger guard then. She had later seen a picture of one that did have a trigger guard in a maga-zine. She said ADC's guns do not have trigger guards. She agreed that the Defender had several different features, such as the rebounding hammer, a spring-loaded lever to open the barrel, and a positive cross-bolt safety system. She examined five guns from different manufactures and said that, while all have similarities and differences, the ADC gun and the Defender looked more alike.

Geer said she ordered a Defender at the 1993 Shot Show, but never received it. She told representatives of ADC that the new gun "looked a lot to me like their product." She had no knowledge that Bond had taken anything from ADC.

STEVEN ESKRIDGE

Steven Eskridge testified as an expert witness in the field of weapons. He is a graduate of West Point with a degree in mechanical engineering, who served in the army for four years and ran a gun-barrel manufacturing company in South Carolina. At the time of trial, he was building high-grade competition and hunting rifles.

Eskridge had examined ADC's Model 1 and Bond's Defender, making a piece-by-piece comparison of the two. He displayed pictures that showed the two assembled, along with a Davis derringer. He also displayed pictures of the weapons disassembled and pictures of the components of each that he determined to be similar. His overall opinion was that the Defender was, from a general mechanical standpoint, really no different than the ADC Model 1. The frame of the Defender, although somewhat modified and larger, was "generally the same frame." The "spring hammer guide" on the Defender, although modified from the Model 1, was "the same thing." Noting that the Defender's "torsion spring," the part that acts to return the hammer, was on the opposite side from the Model 1's, Eskridge said that the hammers were "virtually" the same. The triggers were virtually the same, except for "a little lip coming up here on the Defender trigger." Other differences, he said, were cosmetic.

Eskridge testified that, at ADC's request, he modified a Model 1 to incorporate the

5. "Double-actions."

"rebounding hammer" feature he found on the Defender. He said he did so from an originally cast part in about five or six hours. The modification required a different spring, which he made, and milling of the hammer to accommodate the spring and allow the spring guide clearance. When he completed the modifications, Eskridge shot the modified Model 1. He said that these same features appear in ADC's "DA .38."

On cross-examination, Eskridge agreed that the frames of the Defender and the Davis derringer were "outwardly" more similar than the Defender and the Model 1. He said the triggers and the hammers on all three guns were similar and the Defender was a "higher quality gun."

Eskridge said the concept of the octagonal barrel had been used on guns for many years. The rebounding hammer was not commonly used on derringers, although the idea was not unique in the gun industry. He further said that the automatic extractor, the cross-bolt safety, and the spring-loaded retractable firing pin are found in other guns and all are common knowledge in the industry.

## B.

Greg Bond testified on his own behalf and presented several other witnesses.

GREG BOND

Bond said he grew up in West Texas and had used guns since he was ten or eleven years old. He graduated from the University of North Texas with a degree in industrial technology. After college, he went to work at Tye Manufacturing as a tool and die apprentice, working under a master tool and die maker. After five years, he received a certificate as a journeyman tool and die maker. Later, he was awarded a degree in mechanical engineering at Texas Tech University. While there, he designed and built a gun to fire caseless ammunition. He said these studies employed techniques that he used while working for ADC.

After graduation from Texas Tech in 1988, he went to work for Texas Instruments as a mechanical design engineer in the tooling department. While at TI, he heard about an advertisement for a position at ADC. He contacted the company, visited its plant, and interviewed with Bob Saunders. He said that Bob did not ask him about his qualifications, but spent most of the time talking about how many back-orders the company had and how they needed to speed up production to meet demand. They looked at the gun drill and Bob asked if Bond thought he could make it work; he said "yes." He said their luncheon meeting was not what he would describe as an interview, but rather was "a real casual meeting." He said they went to Saunders' home, test-fired some of the guns, and "that pretty much concluded the interview." After negotiations, he began work on August 5, 1991.

Bond explained the process of "investment casting" to make molds for product parts. He said he had owned a derringer before going to ADC and was aware of some of the safety problems that derringers had. He said that before he accepted the job at Texas Instruments, he had sent a lot of resumes to gun companies because he had always had an interest in firearms.

Bond said that, when he started working for ADC, the company had no safety manual or employee manual, both of which he felt needed to be developed. His initial task was to fix production problems associated with the "DA." That took about a month and a half. Next, he worked on a safety problem associated with the DA. He then began work on the gun drill, working on it until late November, when it was placed into operation and "increased the production of the barrels tremendously."

He next worked on the problem of drilling a necessary hole in the barrel of the Model 1 in a precise location—to correct a procedure that allowed the hole to be drilled in different locations. He said that sixty per cent of his time was spent on production matters and the rest was spent on "general engineering" and employee relations. He said that, although he was hired as "plant manager," he had no authority to fire or discipline the employees who worked in the plant. He hired one person just before he left ADC.

Bond testified that the Model 1 had a lot of safety problems, which he addressed, includ-

ing the fact that the safety was so small that it allowed the hammer to hit the firing pin if the weapon were accidentally bumped. He redesigned the safety, but Bob Saunders never authorized the change. He suggested several other changes in the production process that were never implemented.

Bond said that he did "a lot" of drawings of tooling fixtures and general tooling designs while at ADC. He said he kept the drawings when he left, as a sort of "portfolio" that might be helpful "in the interview process." Bond testified that his Defender incorporated some of the features Bob Saunders had rejected for the ADC guns, including at least one modification based on a customer complaint.

Bond said he had no advance warning when he was fired by Bob Saunders. He related incidents about work he had done and recommendations he made that were never addressed or were ignored by Saunders. He said he saw a copy of a letter near the copy machine before he was fired that indicated another employee was going to be promoted to plant manager. He acknowledged that, at the time he was fired, the Saunders were upset about the rate at which a new project was advancing.

Bond testified about the features he incorporated into the Defender:

- the octagon-shaped barrel had been discussed at ADC for use on the Model 1, but "it just kind of died"; it is found on weapons made by other manufacturers;
- the automatic extractor was different on the Defender only in that he used a "compression spring," which was used by other manufacturers and cost about thirty-two cents; ADC did not use it and he said it was not discussed while he was there;
- the retractable spring-loaded firing pin was used by ADC and in "practically all" of the derringers on the market; it was discussed while he was with the company;
- the cross-bolt safety used by other companies, but not by ADC; he said it is one of the most common safeties on all firearms; prior to his leaving ADC, another

employee asked if he thought ADC could put a cross-bolt safety on the Model 1; Bond said he "passed it off" and never heard of it again; and

- the rebounding hammer, which the Defender had and the ADC guns did not, is "common to self-loading semi-automatic pistols" and is a "common method of keeping the hammer off the firing pin"; it was never discussed at ADC.

He said that he was aware of all of these features before he went to ADC.

Bond testified that he "toyed with" the idea of designing a gun before he was fired by ADC. It never went beyond the "concept" stage and he had committed nothing to paper. He said he had spoken to Don Pilant, the owner of Custom Molds and Tools in Waco. He told Pilant that "things were getting kind of flaky down at American Derringer, and I really didn't know what was going to happen, but if—if I was asked to leave, fired, laid off, whatever, I thought I might want to come up with a different gun." He decided to design and build a gun "the day I was fired." His initial concept included having a trigger guard; a longer grip that would accommodate at least two fingers, a feature that was an option on ADC guns; and interchangeable barrels, an idea that Bob Saunders rejected before Bond went to work at ADC, but which was discussed while he worked there.

He said he started to design his gun right after he was fired, using a computer with a design program that he had borrowed about a week earlier. It took two and one-half months to design a gun and it went through "four generations of design" to get to the Defender. He said two and one-half months was a "fairly short" time to design a gun but "certainly not unusual." Custom Molds and Tools had computer-driven machinery that sped up the process; he was designing as Custom Molds and Tools was working on prototypes. He said he was spending between eleven and sixteen hours a day "because I wanted to make it to the Shot Show in 1993." By the time the show opened, he had six guns for display. He said that, although the prototypes and the production models look the same, he did a "complete

redesign" of the gun between the time of the 1993 Shot Show and the beginning of production. The rebounding hammer and the locking lever were both redesigned, the first completed in June of 1993 and the second completed about two months later. He said he used the knowledge, training, and experience that he received at North Texas, Tye Manufacturing, Texas Tech, Texas Instruments, and ADC in designing and building the Defender.

Bond compared guns from six manufacturers and said that all were "patterned after the Remington style derringer." He said that other frames were closer in design to the ADC derringer than the Defender. He said that the ADC Model 1 and the Defender were modeled after the Remington pattern derringer of 1866. He said he would have designed the same gun for ADC if they had wanted him to.

Production of the Defender began in March of 1994. Bond said he obtained suppliers by consulting the *Thomas Register*, a listing of manufacturing concerns in the United States, available in the public library. His customer list came from contacts made at the 1993 Shot Show. He said he did not "steal" any customers from ADC, solicit any of its customers, remove any drawings from ADC other than copies of those he made, or take the company's research and development.

On cross-examination, Bond said his experience with derringers before working for ADC was limited to his ownership of two of the guns and perhaps working on other peoples' guns; he had no experience in the manufacture of derringers. He agreed that he had chosen to design a derringer, with which he had eleven months experience at ADC, rather than a rifle, a shotgun, or a larger pistol. He said he wanted to compete with Bob Saunders. Asked if he was free to use an idea that ADC was using after he left, Bond said, "Once I was fired, if—if there was an idea and I needed—you know, like in any kind—Yeah, you can use those ideas, if it's not patented." He said he was made aware of no confidential information at ADC, although he denied believing that all its information was in the public domain. He knew

that ADC did not publish customer complaints.

He restated that, prior to leaving ADC, he had (1) "make some sketches" of guns, (2) talked with a machine shop about producing a gun, (3) borrowed a computer with design capabilities, (4) looked into the feasibility of producing a gun in the future, (5) heard "a lot of rumors," and (6) gotten a lot of negative feedback from Elizabeth Saunders. He said he described the proposed gun to Pilant in "very loose terms," but said that he wanted "to do something along the [lines of a] Remington pattern derringer."

Bond admitted that he obtained information about customer complaints while at ADC and that his duties included addressing those complaints. He said that all of the drawings that were ever made of the Model 1 were available to him and that he had keys to the ADC offices and the code to the alarm system. He said that customer feedback is a primary determinant of the design of a gun.

Bond said that when he designed the Defender on the computer he worked from a blank page looking at "several derringers and other types of guns," including an ADC Model DA .38. He said he did not have a Model 1, although he had a Model 1 hammer to look at. He also said that he attempted to address known hazards, such as accidental or unintentional discharge. His solution was the cross-bolt safety, a solution that was discussed while he was at ADC. Other features he considered or used had been discussed at ADC: a larger grip to accommodate more than one finger; a rebounding hammer, which the Model DA .38 had; and interchangeable barrels. He also sought to solve the problem that most derringers, including the ADC guns, shot high.

On redirect examination, Bond maintained that knowledge of the design of derringers is in the public domain, available in books and parts lists. He said that the design of the Defender was "totally different" from that of the Model 1.

NANETTE BOYER

Nanette Boyer, an employee of Texas Instruments, testified that she hired Bond to work for TI. She said he was "a very strong

design engineer and already came to TI with a lot of experience from his tool and die maker days." She said he was "very honest" and had "very high integrity." She would hire him again.

FRANK TURNER

Frank Turner owns and operates Classic Arms Company in Burnett, a manufacturer of small single-shot rifles. He said he had been working with guns for forty years and had designed and built guns. He said his company built two molds for the Defender—a hammer mold and a hammerhead mold. He described the *Thomas Register* (a listing of manufacturers and products), *World Guide to Gun Parts* (giving parts breakdowns), and *Numrich Gun Parts* as publications available to the general public. He described Bond as "very knowledgeable in design" and the Defender as "a good piece." He said Bond was, in his opinion, an honest man.

DEE WAYNE WHITEHEAD

Dee Wayne Whitehead, a custom gunsmith, said he had owned and worked on derringers and that the design of derringers is in the public domain. He said that the Defender was a safer or higher-quality gun than most derringers because of such features as the rebounding hammer, a barrel locking mechanism, the safety, and the hammer system.

STEVEN WAYNE CARTER

Steven Wayne Carter did assembly work on a double-action derringer for ADC and later worked on the Model 1. He became plant manager when Bond left. He said that Bond developed an employee handbook and generally increased production while he was with ADC. He said the idea of a rebounding hammer was not discussed at ADC until after they saw the Defender at the Shot Show and that no work was done at ADC by Bond on interchangeable barrels. He said that ideas about an automatic extractor, a trigger guard, the cross-bolt safety, and other "safety features" were talked about among the employees and some of those features were presented to either Bob or Elizabeth Saunders.

He said the reason the Geers ordered the Defender at the Shot Show was to provide it to ADC for examination. On cross-examination, he said that, although he assisted ADC before and after the suit was filed by telling Elizabeth Saunders things he had learned "through investigation or otherwise," he warned Bond that ADC was about to file suit against him.

GARNETT SHELTON GRANT, JR.

Shelton Grant, a gun designer and builder, said he worked for ADC assembling derringers for three and one-half years in the early 1980's. He said that Bob Saunders was not very amenable to changes in the Model 1, although several changes were discussed. He said he saw the Defender at the Shot Show in Houston, met Bond, discovered they had a common interest in guns, and discussed going into business with him.

DON PILANT

Don Pilant owned Custom Molds & Tools in Waco. He said Bond first came to him seeking someone to machine parts for a gun. A couple of weeks later, Bond returned, told Pilant he had been fired from ADC "a day or so before," and inquired whether he was still available for machine work. Three weeks after that, Bond returned with some "very preliminary" design work he had done on a computer Pilant had loaned him. Thereafter, Pilant worked on gun parts while Bond modified the design.

MONA BOND

Bond's wife, Mona, testified about conversations with him, about the work he did on the computer that he borrowed a week and a half before he was fired, and about rushing the project to be ready for the 1993 Shot Show. She described the process for obtaining space at the show and said they did not go to the 1994 show because of the temporary restraining order. She testified that they had received an offer to sell Texas Arms prior to the lawsuit but had received no offers since.

## SUFFICIENCY OF THE EVIDENCE OF NO PROBABLE CAUSE

■ ADC's first point concerns the fourth element of Bond's malicious prosecu-

tion claim.[6] It asserts that the evidence is legally or factually insufficient to support the jury's finding that ADC lacked probable cause for the proceeding. As usual, when both legal and factual sufficiency points are asserted, we address the legal sufficiency point first. *Marshall v. Ford Motor Co.*, 878 S.W.2d 629, 631 (Tex.App.—Dallas 1994, no writ) (citing *Glover v. Texas Gen. Indemn. Co.*, 619 S.W.2d 400, 401 (Tex.1981)).

When the complaining party raises a "no-evidence" point [7] challenging the legal sufficiency of the evidence to support a finding that favors the party who had the burden of proof on that finding, we must sustain the finding if, considering only that evidence and the inferences which support the finding in the light most favorable to the finding and disregarding evidence and inferences to the contrary, any probative evidence supports it. *See Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993).

The Supreme Court has said that a no-evidence point can only be sustained when the record reveals one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law or rules of evidence bar the appellate court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990).

The historical statement of the legal sufficiency test is found in *Brookshire Grocery Co. v. Richey*, 899 S.W.2d 331, 334–35 (Tex. App.—Tyler 1995, writ granted), a malicious prosecution case that arose out of a prior criminal proceeding. The Tyler court applied the rule that if reasonable minds cannot differ from the conclusion that the evidence offered to support the existence of a vital fact lacks probative force, it will be held to be the legal equivalent of no evidence. *Id.* at 335. "When the facts which bear on probable cause are not in dispute, the issue of probable cause is a question of law to be decided by the court." *Id.* at 334 (citing *Montgomery Ward & Co. v. Kirkland*, 225 S.W.2d 906, 908 (Tex.Civ.App.—San Antonio 1949, writ ref'd n.r.e.)).

Appellate review of the legal sufficiency of the evidence supporting a negative finding always presents unusual problems. *See Lyons v. Millers Casualty Ins. Co. of Texas*, 866 S.W.2d 597, 600 (Tex.1993). Among these is the "conundrum of a reviewing court scouring the record" to evaluate a claim that there is "no evidence" of a negative fact—here, the fact of no probable cause. *See id.* We borrow from the review process used by the Supreme Court in *Lyons* to review findings of bad faith by an insurance company, which includes a review of a negative finding because one element of bad faith is "no reasonable basis" for denying a claim:

> [W]hen a court is reviewing the legal sufficiency of the evidence supporting a bad faith finding, its focus should be on the relationship of the evidence arguably supporting the bad faith finding to the elements of bad faith. The evidence presented, viewed in the light most favorable to the prevailing party, must be such as to permit the logical inference that the insurer had no reasonable basis to delay or

---

**6.** The fifth element of malicious prosecution—termination of the proceeding in plaintiff's favor—is not before us, even though the malicious prosecution claim was asserted as a counterclaim. By not discussing it, we do not imply that the counterclaim was properly brought, particularly in light of the recent decision in *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203 (Tex.1996), holding that an underlying civil suit has not "terminated" in favor of a malicious prosecution plaintiff until the appeals process for that suit has been exhausted.

This case demonstrates the advisability of that rule. Some of the evidence we have discussed was admissible on the question of whether Bond actually misappropriated ADC's trade secrets but, as *Akin v. Dahl* holds, not relevant to the existence of probable cause because the events occurred after ADC's suit was filed. 661 S.W.2d 917, 920 (Tex.1983), *cert. denied*, 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). In addition, events not known to ADC could not have entered into its determination of whether there was probable cause to believe Bond had misappropriated its secrets.

**7.** We use the terminology suggested in William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX. L.REV. 515, 517–19 (1991).

deny payment of the claim, and that it knew or should have known it had no reasonable basis for its actions.

*Id.* We believe that a similar process can and should be used to review a finding of no probable cause in the context of malicious prosecution. Applied to these facts, we inquire whether the evidence, viewed in the light most favorable to Bond, permits the logical inference that ADC had no probable cause to believe that Bond had misappropriated its trade secrets. *See id.* We focus not on whether ADC's claim was valid, but on the reasonableness of its conduct in instituting the suit. *See id.* at 601. The evidence we consider is that which relates to the tort issue of probable cause, not just to the issue of whether Bond actually misappropriated ADC's trade secrets. *See id.* at 600.

■■■■ Thus, we consider only events that occurred before ADC sought injunctive relief against Bond. *Akin v. Dahl,* 661 S.W.2d 917, 920 (Tex.1983) (events subsequent not material to the beliefs and motives at the time proceedings were instituted), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984).[8] We consider only evidence of ADC's beliefs, motives, and good faith in making its determination to file suit. *See id.* at 921. We reiterate that we are not engaged in a review of the jury's finding that Bond did not misappropriate ADC's trade secrets—only the finding that ADC had no probable cause to believe that he did.

■■■ Bond contemplated selling to the public a product that was in competition with ADC's products. It conclusively appears from the record that some of the details of the design and process used by ADC to manufacture its derringers were of a type that are subject to protection in equity as trade secrets. *Hyde Corp.,* 314 S.W.2d at 776. The information that ADC considered confidential included its drawings, the knowledge it gained through experience over several years of manufacturing derringers, various features that had been discussed within the company while Bond was an employee,

and customer complaints and comments. The most unique information was that derived from customer complaints.

Bond's employment by ADC gave rise to a duty not to use ADC's proprietary information and trade secrets in a manner adverse to it. *Miller Paper,* 901 S.W.2d at 600 (holding that the duty arises out of the employer-employee relationship). Although the information was not patented, it need not be. *K & G Oil Tool,* 314 S.W.2d at 789. That Bond might have learned about derringers through other means, such as inspection, books, parts lists, and the like, does not necessarily mean that ADC knew that he did so. *See id.* at 788. "The question is not, 'How could he have secured the knowledge?' but 'How did he?'" *American Precision,* 764 S.W.2d at 277.

Bond admits that he gained full knowledge of the details of the design, the manufacturing process, and customer comments and complaints while he was an employee of ADC. Indeed, ADC employed Bond to learn all about and improve its product. Within six months of his being fired, ADC learned that Bond was offering a similar gun for sale. ADC knew that Bond had access to all of the information that it possessed about how to manufacture derringers, including its customer complaints.

We find that ADC had a legitimate interest in protecting confidential information relating to the design and manufacture of its derringer. We start with a presumption that ADC acted reasonably and in good faith and therefore had probable cause to institute the suit. *Ellis County State Bank v. Keever,* 888 S.W.2d 790, 794 (Tex.1994); *Akin,* 661 S.W.2d at 920. Evidence of events that occurred after ADC filed suit is not evidence of no probable cause. *Akin,* 661 S.W.2d at 920. Evidence of acts that Bond took before ADC filed suit is not evidence of no probable cause, unless ADC knew or should have known about them. *See id.* Evidence of other sources of information which Bond used but which ADC did not know that he used is not evidence of no probable cause.

8. Although ADC argues that the court's submission of the misappropriation question to the jury should be considered in determining whether it had probable cause, the Supreme Court has held

otherwise. *See Akin,* 661 S.W.2d at 920 (beliefs and motivations of the party instigating the underlying suit are examined, not those of the tribunal).

*See American Precision,* 764 S.W.2d at 277. Viewing the remaining evidence from the standpoint of a reasonable, prudent person under the circumstances with which ADC was faced, we find no evidence that the motives, grounds, beliefs, and other evidence upon which ADC acted were not probable cause to institute the proceeding that resulted in the injunction being issued. *See Akin,* 661 S.W.2d at 920; *Brookshire Grocery,* 899 S.W.2d at 337. Considered another way, that evidence, when viewed in the light most favorable to Bond and taking into account the law on trade secrets that we have outlined, does not permit the logical inference that ADC had no probable cause to believe that Bond had misappropriated its trade secrets. *See Lyons,* 866 S.W.2d at 600. We sustain point one.

Because we sustain a legal-sufficiency point, we will reverse the judgment and render judgment that Bond take nothing by his counterclaim. *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 176 (Tex.1986) (generally, if the court of appeals sustains a "no evidence" point, it is the court's duty to render judgment for appellant) (quoting *National Life Accident Ins. Co. v. Blagg,* 438 S.W.2d 905, 909 (Tex.1969)).

### OTHER POINTS

Having decided that there is no evidence to support one of the findings essential to Bond's counterclaim, we do not reach the points of error complaining of the damages he was awarded, the court's charge to the jury, or the award of attorney's fees.

### ANTITRUST COUNTERCLAIM

During the presentation of his case, Bond's counsel stated:

> Your honor, [counsel for ADC] and I have discussed a stipulation regarding certain individuals that have testified in deposition, by deposition in this case, and their testimony goes to the antitrust action that we brought to be our counterclaim, and at this point we would—the stipulation between [counsel] and I is that if the following persons were called to testify in this case, that they would testify to those things

testified to by them in their depositions taken in this case. And I'm going to offer the transcript of those depositions to the Court to consider as evidence on the antitrust cause of action. Those persons are Ed Petrich, Jimmy Seay, S–E–A–Y, Ken Remson, R–E–M–S–O–N, and Jerry Ahern, A–H–E–R–N.

Counsel for ADC agreed to the stipulation. The court said, "All right. Is that the sum and substance of it." Counsel for Bond replied, "That is the sum and substance, Your Honor."

During the charge conference, Bond submitted several proposed questions on his anti-trust theory for inclusion in the charge. The court refused them all.

Without citation of any authority, any references to the record, or discussion about which proposed questions he contends should have been submitted, Bond asserts in a cross-point that the court erred in refusing to submit the antitrust theory to the jury "based upon the evidence presented during the trial of this case."

■ We hold that the cross-point has been waived for failure to (1) set out a fair, condensed statement of the facts pertinent to the cross-point, with references to the pages in the record where those facts may be found, (2) discuss the facts and the authorities relied upon to maintain the point, and (3) set out in full the questions that Bond contends should have been included in the court's charge. *Fredonia State Bank v. General American Life Ins. Co.,* 881 S.W.2d 279, 284–85 (Tex.1994); TEX.R.APP.P. 74(f), (p).

### CONCLUSION

We reverse the judgment of the trial court and render judgment that Bond take nothing by his counterclaim. All costs of appeal are adjudged against Bond as appellee.