NO. 07-01-0375-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



DECEMBER 11, 2001



______________________________




ANDERSON CHEMICAL COMPANY, INC., APPELLANT



V.



ART GREEN, INDIVIDUALLY, AND ALPHA LABS, INC., APPELLEES




_________________________________



FROM THE 72ND DISTRICT COURT OF LUBBOCK COUNTY;



NO. 2001-514,900; HONORABLE J. BLAIR CHERRY, JUDGE



_______________________________



Before BOYD, C.J., and QUINN and REAVIS, JJ.

 Appellant Anderson Chemical Company, Inc. brings this interlocutory appeal from
the denial of a temporary injunction. Appellant sought a temporary injunction prohibiting
appellees Art Green (Green) and Alpha Labs, Inc. (Alpha) from violating Green's covenant
not to compete with appellant, to prohibit the disclosure of confidential information, and to
prevent the solicitation of other employees of appellant. In two issues which are argued
together, appellant contends the trial court misapplied the law to the facts of the case. It
also contends the evidence presented at the hearing by both parties "does not support the
order." Disagreeing that either issue presents reversible error, we affirm the judgment of
the trial court.

 Green worked for appellant as a salesman of water treatment systems from 1990
until July 5, 2001, at which time he went to work for Alpha, a competitor. The parties
stipulated that Green signed an employment agreement with appellant in 1990 that
contained a covenant not to compete. Since terminating his employment with appellant,
Green has solicited customers he had serviced while employed by appellant within the
geographic area proscribed by the employment agreement. Although it initially issued a
temporary restraining order, on August 28, 2001, at a hearing on appellant's request, the
trial court declined to issue a temporary injunction without stating the basis for its ruling.

 The purpose of a temporary injunction is to preserve the status quo pending a trial
on the merits. Walling v. Metcalfe, 863 S.W.2d 56, 58 (Tex. 1993). To be entitled, an
applicant must show a probable injury and a probable right of recovery at the final hearing. 
Id. at 57. We review the denial of a request for temporary injunction under an abuse of
discretion standard, and we may not reverse that decision absent an abuse of that
discretion. Id. at 58. A court abuses its discretion when it misapplies the law to the facts
or when the evidence does not reasonably support the findings. State v. Southwestern
Bell Tel. Co., 526 S.W.2d 526, 528 (Tex. 1975). In making our review, we draw all
legitimate inferences from the evidence in the light most favorable to the trial court's
judgment. Miller Paper Co. v. Roberts Paper Co., 901 S.W.2d 593, 598 (Tex.App.--Amarillo 1995, no writ). Where, as here, the trial court does not make findings of fact and
conclusions of law, the judgment may be upheld on any legal theory supported by the
record. Davis v. Huey, 571 S.W.2d 859, 862 (Tex. 1978).

 Whether a covenant not to compete is enforceable is a question of law. Light v.
Centel Cellular Co. of Texas, 883 S.W.2d 642, 644 (Tex. 1994). A covenant not to
compete is enforceable if it is ancillary to, or part of, an otherwise enforceable agreement
at the time the agreement is made. However, the covenant is only enforceable to the
extent that it contains reasonable limitations as to time, geographic area, and if the scope
of activity to be restrained does not impose greater restrictions than necessary to protect
good will or other business interests. Tex. Bus. & Com. Code Ann. § 15.50(a) (Vernon
Supp. 2001).

 In his contract, and in relevant part, Green agreed:

 (a) Non-competition. The Employee covenants and agrees that, for a period
of one (1) year from the termination of the Employee's employment for any
reason whatsoever, with the exception of the points discussed in paragraph
2 of this agreement, the Employee will not within the Territory directly or
indirectly compete with the Employer by carrying on a business which is
substantially similar to the Business (as defined in subsection (d)). . . .


* * *



 (d) Business. For purposes of this Agreement, the term "Business" shall
mean (i) the sale or solicitation of sales of chemical products relating to the
treatment and conditioning of water and other substances and comparable
to the Products hereunder as of the termination of employment, (ii) the
servicing of the accounts of the purchases of such products, or (iii) both (i)
and (ii).



By map and in writing, the "Territory" was defined to be an area in West Texas. The court
indicated at the hearing that it was not concerned with the issue of the reasonableness of
the limitations of the covenant, and it did not abuse its discretion in that regard.

 Thus, section 15.50 requires that we determine if there is an otherwise enforceable
agreement to which the covenant not to compete was ancillary to, or a part of, at the time
it was made. Light, 883 S.W.2d at 644. An "otherwise enforceable agreement" can result
from at will employment as long as the consideration for the promise is not illusory. Id. at
645. Any promise that depends on an additional period of employment is illusory because
it is conditioned on something within the exclusive control of the employer who retains the
option of discontinuing employment. Id. n.5. 

 In his employment contract, Green made a number of non-illusory promises to
appellant, which include:

 1. Upon termination, to return all of appellant's property.

 2. For one year after his termination, not to induce any employee of
appellant to go to work for any other employer.


 3. Upon termination, to keep confidential appellant's pricing information,
marketing information, sales technique or any other confidential information,
including client and customer lists, client requirements, terms of contracts
with clients and planning and financial information of appellant.


 4. To give ten days notice prior to terminating his employment.


 In order to form an enforceable agreement, appellant must have given some
corresponding non-illusory promise to Green. See CRC-Evans Pipeline Intern. v. Myers,
927 S.W.2d 259, 263 (Tex.App.--Houston [1st Dist.] 1996, no writ). A promise not to
disclose an employee's proprietary information which is later accepted by the employer's
performance in providing that information to the employee is a unilateral contract that
cannot support a covenant not to compete because it is not otherwise enforceable at the
time it is made. Light, 883 S.W.2d at 645, n.6. The instant agreement contains no
promise on the part of appellant to furnish Green with confidential information. Thus, even
if appellant gave such information to Green, at the time it was made, there was no
enforceable agreement.

 Appellant also promised that if it failed to make Green the manager of its West
Texas territory when Bill Dawson ceased to work for it, the non-compete agreement would
not bind Green. Specifically, that clause provides:

 Bill Dawson of 5 Winged Foot Circle, Abilene, Texas, is currently employed
by Employer; upon Bill Dawson's ceasing to work for Employer, then West
Texas will become its own territory and 25% of the sales in this territory will
go to the territory. At this time Employee will become the manager of this
territory based upon Employee's ability to meet past and current agreed
performance parameters.


 Should Employer not live up to this part of the contract then Employee may
terminate this contract with 10 days written notice. Should Employee wish
to terminate this agreement do [sic] to Employer's noncompliance with this
specific paragraph, Employee will not be bound by the non-compete clause
of this agreement.


It readily appears that this provision is conditioned on Green's continued employment with
appellant until such time as Bill Dawson ceased to work for appellant. While appellant
argues that the clause had no effect until Green's termination, under the contract,
appellant could terminate Green at any time prior to the time Dawson left his employment
with appellant. That being so, the promise was illusory. Therefore, it can be said that an
enforceable agreement existed only insofar as Green was required to return appellant's
property upon termination, refrain from inducing other employees to leave appellant, and
to give ten days notice prior to termination in exchange for appellant's obligation to give
ten days notice prior to its termination of Green's employment.

 However, our inquiry does not end at this point. We must determine whether the
consideration given by the employer to the employee in the otherwise enforceable
agreement is sufficient to justify the employer's interest in restraining the employee from
competing. Light, 883 S.W.2d at 647. The covenant must also be designed to enforce the
employee's return promise in the otherwise enforceable agreement. Id. In this case,
appellant's promise to give ten days notice prior to a termination of Green's employment
is not sufficient to give rise to any interest it might have in restraining Green from
competition. See Donahue v. Bowles, Troy, Donahue, Johnson, Inc., 949 S.W.2d 746, 752
(Tex.App.--Dallas 1997, writ denied). That being true, the trial court would not have
abused its discretion in concluding that the covenant not to compete was not ancillary to,
or a part of, the otherwise enforceable agreement.

 Moreover, even if the requirements of section 15.50 had been met, the trial court
could have found appellant failed to show a probable right to relief because Green
terminated his employment pursuant to the provision of the contract that allowed him to do
so if his termination was because of appellant's failure to honor its commitment to make
him area manager based on Green's ability to meet past and current agreed performance
parameters. The evidence showed that although Green had been made an area manager,
one year prior to his termination, appellant eliminated the position, with the exception of
one area not included in Green's area. The evidence also showed that Green had
received numerous awards and favorable comments from his supervisors with no negative
comments in his personel file. Even though the contract did not specifically forbid the
elimination of the position of area manager, there was evidence to support a conclusion
that Green was entitled to use the escape provision.

 We must now determine if the trial court abused its discretion in failing to grant a
temporary injunction to protect against the disclosure of confidential information. A non-disclosure provision may be enforceable even if a non-compete provision is not
enforceable and such a provision is not required to contain reasonable restrictions as to
time, geography, and scope of activity. Zep Mfg. Company v. Harthcock, 824 S.W.2d 654,
663 (Tex.App.--Dallas 1992, no writ). Green's contract provided in pertinent part:

 8. Trade Secrets. Employee hereby recognizes that unpublished items of
technical or non-technical information, such as (but not limited to) Product
chemical compositions and chemical properties, formulas, chemical dosage
calculation procedures, marketing plans and direct selling systems, customer
lists, supplier lists and technical and commercial information relating to
customers or business projects used by Employer in it's [sic] business,
constitute valuable trade secrets or confidential information (referred to
hereafter collectively as "Trade Secrets") which are the property of
Employer. Employee shall not disclose or use Trade Secrets other than in
the business of Employer. Employee specifically agrees:


 (a) Not to directly or indirectly, disclose or make available to anyone not
employed or affiliated with Employer or use outside of the Employer
organization during or after his employment any Trade Secret;


 (b) To safeguard all Trade Secrets at all times so they are not exposed to,
or taken by, the unauthorized persons, and when entrusted to him, to so
exercise his best efforts to assure their safe-keeping;


 (c) To deliver in the event of termination of his employment, as provided in
paragraph 4, all of Employer's property, including personal notes and
reproductions, relating to Employer's business and Trade Secrets in his
possession or control; . . .


 9. Confidential data. The Employee further agrees that the Employee will
keep confidential and not directly or indirectly divulge to anyone, nor use or
otherwise appropriate for the Employee's own benefit, any pricing
information, marketing information, sales technique of the Employer or any
other of the confidential information or documents of or relating to the
Employer, including but not limited to, confidential records, computer
software programmes [sic] or any portions or logic comprising said
programmes [sic] client and customer lists, information about client
requirements, terms of license agreements, terms of contracts with clients
and customers, and planning and financial information of the Employer
(hereinafter referred to as the "Confidential Data") . . . .


 At the hearing, Green admitted that since he went to work for Alpha, he has called
on, and accepted, clients or customers that were his while he worked for appellant. 
However, he testified that "any water treatment salesman, working a particular town, is
going to know who the largest accounts are and should know who is servicing those
accounts. It is nothing secret." Green had access to pricing and product information while
working for appellant, and in one instance, after commencing work for Alpha, a former
customer gave him a list of appellant's chemicals and asked Green for a recommendation
on pricing. Green knew what those chemicals were and what they were used for without
having to consult any of appellant's materials.

 Nevertheless, Green averred, he had returned appellant's materials to it upon his
termination and did not have any customer lists or pricing lists. Also, appellant did not
share its formulas with Green. He did have access to chemical information on drums
supplied to customers, but they are the same products used by any water treatment
company. Before giving any bids to a previous customer of appellant's, Green went and
visited with the customer to ascertain their needs, even though he may have had some
knowledge of those needs before the visit. As an Alpha employee, he used Alpha's price
list in preparing his bids. Those price lists are the same for all customers, except one list
includes freight and one does not. In one instance, Green informed Alpha that appellant
used a particular model of a pump that could be ordered by anyone.

 Mike Povlinko, Green's former supervisor with appellant, testified that appellant's
confidential information includes price books, pricing information on its products,
proprietary formulations of its products, product application and control guidelines,
customer lists, billing information, customer contacts, and phone numbers. He testified
that if a competitor knew appellant's pricing structure, they could under price appellant. 
Additionally, he opined, if a competitor knows the chemical specifications and formulations
of the products, he would know how a particular product performed in the system and
whether it would keep the customer's equipment safe and clean. He averred that Green
had access to price lists, customer lists, and products and application guides.

 However, Povlinko admitted he did not have any nondisclosure agreement with
appellant, although he probably had access to more information than Green. Furthermore,
there were other regional sales managers that did not have such agreements. Povlinko
also admitted that Green did not have access to the company formulas, the cost of
products other than pricing information for his territory, locked files, or to password-only
computer networks. He agreed that those in the industry pretty well know who the large
potential customers are in any given town or city and who is currently servicing those
customers. He also admitted that "there really are not many secrets in the chemical
business."

 Gary Riddle, a technical service technician for appellant, stated that if Green walked
onto a site and saw one of appellant's drums, he would know more than the average
competitor about what was in it because the number on the drum identifies the strength of
the chemical. Green would not have to have the contents tested to know which of Alpha's
products might be comparable to it. Riddle admitted that although the chemicals and 
equipment may change, the general knowledge can be applied from one competitor to the
next.

 Hal Guymon, appellant's executive vice president, testified that appellant's
confidential information includes customer lists, price information, information on product
application, and the information used to develop bids for customers, including calculation
programs. If Green had artificially inflated prices while he was still employed by appellant,
it would give him an advantage when he went to work for a competitor because he could
then undercut those prices. Although he considered appellant's customer list confidential,
Green agreed that those in the industry basically know which company is servicing which
client.

 Steve Price, president of Alpha, was reluctant to name his biggest accounts,
although he agreed that everyone in the industry knows the major prospects in a town who 
are buying water treatment, and that his major competitors have a good idea of the volume
of his accounts. In any particular town, he would look at hospitals, offices, buildings, large
manufacturing plants, and processing plants as potential customers because they have
steam boilers and cooling tower systems. Therefore, it is not difficult to identify potential
customers. Furthermore, information as to which entities use boilers can be obtained from
the State Licensing Bureau. Price admitted that Green probably had a lot of knowledge
about appellant's customers, which is a competitive advantage for Green, but he averred
that Green had never given him any of appellant's pricing and that he could not remember
anything about his own company's price list from memory. Price also stated that Green
had no authority to alter Alpha's pricing and that no former client of appellant had been
given special pricing by Alpha. He agreed there were not many secrets in the chemical
business because everyone is using the same thing, just different chemicals and
applications depending on the customers' needs. Prior to the time Green went to work for
Alpha but while he was considering doing so, Green did mention a specific modification
by appellant to some equipment, although Price stated the same information would have
been available to him from the seller of the equipment.

 In addition to contractual obligations, there is a common law duty of an employee
not to use confidential or proprietary information acquired during the relationship adversely
to his employer, and that obligation survives the termination of employment. Thus, while
a former employee may use the general knowledge, skill, and experience acquired during
the employment relationship, he may not utilize confidential information or trade secrets
acquired during the employment relationship. American Derringer Corp. v. Bond, 924
S.W.2d 773, 777 (Tex.App.--Waco 1996, no writ); Miller, 901 S.W.2d at 598. Protected
data includes compilations of information which have a substantial element of secrecy and
provide the employer with an opportunity for advantage over competitors. Miller, 901
S.W.2d at 601; Rugen v. Interactive Business Systems, Inc., 864 S.W.2d 548, 552 (Tex.
App.--Dallas 1993, no writ). Examples include pricing information, customer lists, client
information, customer preferences, buyer contacts, and market strategies. Miller, 601
S.W.2d at 601.

 However, even if certain business information is confidential, the same information
may be capable of being obtained by observation, experimentation, inspection, analysis,
or general inquiry. M.N. Dannenbaum, Inc. v. Brummerhop, 840 S.W.2d 624, 632 (Tex.
App.--Houston [14th Dist.] 1992, writ denied); Jeter v. Associated Rack Corp., 607 S.W.2d
272, 275 (Tex.Civ.App.--Texarkana 1980, writ ref'd n.r.e.), cert. denied, 454 U.S. 965, 102
S.Ct. 507, 70 L.Ed.2d 381 (1981). Even so, the information can still be protected if the
competitor gains it through a breach of confidence without the efforts of observation,
experimentation, inspection, analysis or general inquiry. Dannenbaum, 840 S.W.2d at
632.

 The evidence here showed that Green did not take any of appellant's materials with
him when he left. Although he knew the names of customers and the approximate amount
of their accounts, there was testimony that the same information was generally known by
other competitors. Green had no access to appellant's formulas, and other information
about the contents of drums supplied to customers was written on the drum itself and
available to see. There was also evidence that Green spoke personally to each former
client of appellant that he now services. His purpose was to obtain information about their
needs and to inform them that he was bound to use the Alpha price schedule, which was
the same for every customer, except for freight charges. The products and equipment
used in the industry are available to everyone, and differences that arise do so because
of the needs of different customers. It was generally agreed by all parties that although
the water treatment industry is a highly competitive one, there are generally few secrets.

 Construing the evidence in the light most favorable to the court's ruling, the trial
court could reasonably have found that appellant did not show a probable right to recover
on the claims of breach of confidentiality, misappropriation and conversion of private
information, and breach of fiduciary relationship. This is true because the information
Green received from appellant was either not proprietary or, if he did receive confidential
information, he had not used it adversely to appellant.

 We next consider the non-solicitation clause in Green's contract. That clause
provided:

 5. Non-solicitation of Employees. The Employee covenants that during the
periods for which he is entitled to compensation or other payment hereunder,
and during the one (1) year period immediately following the last of such
periods, the Employee shall neither directly nor indirectly induce or attempt
to induce any Employee of the Employer to terminate his or her employment
to go to work for any other employer, and during such period, the Employee
such [sic] not directly or indirectly hire any employee or former employee of
the Employer.

 During the hearing, Gary Riddle testified that the same week that Green gave his
resignation to appellant, he had seen an advertisement in the newspaper for employees. 
Later, according to Riddle, Green told him that the advertisement had been placed there
for Riddle's benefit. Riddle said he took this to mean that although the advertisement did
not identify Alpha as the hiring company, Alpha was trying to offer him a job. Green told
Riddle that he, Green, did not place the ad, but he could not say anything else and that the
information should remain between him and Riddle.

 Steve Price testified that Alpha ran an advertisement in the San Angelo Times and
perhaps in Abilene seeking an experienced water treatment employee. Although Green
was not yet officially an employee of Alpha, he told Green about the advertisement. Price
stated that anyone could have answered the advertisement. Green denied that he told
Riddle the advertisement was placed for his benefit. Rather, he averred, he told Riddle
that if a competitor was interested in hiring employees from another company, it was better
if the employee approached the new company. Green also said that other competitors
would have been targeted by the ad as well as appellant.

 Although the evidence is somewhat conflicting, it is sufficient to support a
conclusion by the trial court that the advertisement was not targeted specifically at any
particular person, but rather aimed at any qualified water treatment person interested in
employment with another company. It would also support a conclusion that Green was not
an instigator of the advertisement and that he did not actually tell Price that the
advertisement was specifically for Riddle's benefit. It is well established that a trial court
does not abuse its discretion in basing a decision as to a probable right to recover on the
resolution of conflicting evidence in the record. Davis v. Huey, 571 S.W.2d at 862. That
being true, we cannot say that the court would have abused its discretion in concluding
that appellant had not shown its probable right to recover for breach of the covenant in
question here.

 In summary, we have found no abuse of discretion by the trial court in arriving at its
decision. Accordingly, we overrule appellant's issues and affirm the judgment of the trial
court. 


 John T. Boyd

 Chief Justice


Publish.