DSA v. Hillsboro ISD 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-95-295-CV

        D.S.A., INC.,
                                                                                       Appellant
        v.

        HILLSBORO INDEPENDENT SCHOOL DISTRICT,
                                                                                       Appellee
 

From the 66th District Court
Hill County, Texas
Trial Court # 32,483
                                                                                                    

O P I N I O N
                                                                                                    

          Hillsboro Independent School District (HISD) contracted with DSA, a construction
management firm, to oversee the construction of an elementary school. Before the school was
completed, HISD noticed serious problems with the structure of the building and the surrounding
landscaping. HISD attributed these defects to DSA's failure to adequately perform its duties in
the manner promised by DSA during the contract negotiations and in their written, finalized
agreement. HISD eventually brought suit against DSA for breach of contract, negligent
misrepresentation, and violations of the Deceptive Trade Practices Act.


 See Tex. Bus. & Comm.
Code Ann. § 17.41-.63 (Vernon 1987 & Supp 1997). Trial was before a jury, which found
against DSA on each of the three causes of action and awarded HISD $220,661 in actual and
$170,000 in exemplary damages.
          Through twenty-one points of error, DSA essentially complains of five grouped errors:
first, that HISD's DTPA cause of action was barred by limitations; second, that the jury should
have been charged on comparative negligence; third, that the evidence is insufficient to support
the jury's finding of liability on each of HISD's three causes of action; fourth, that the evidence
is insufficient to support the jury's finding of gross negligence; and fifth, that the evidence is
insufficient to support the jury's finding on the amount of damages for the roof. We affirm the
judgment as reformed.
I. FACTUAL BACKGROUND
          To dispose of DSA's points of error, a more thorough rendition of the facts is necessary. 
In 1984 the voters in the Hillsboro Independent School District passed a bond election that
authorized its school board to spend $2,050,000 for the construction of a new elementary school. 
However, all the bids received were at least $300,000 more than the amount of bonds approved
for the construction, and the HISD school board, consequently, rejected each bid. In an effort to
locate a more affordable means of seeing the school constructed, Maurice English, then
superintendent of HISD, suggested to the board that they speak to DSA. The board members
agreed, and a meeting was arranged.
          At the meeting, DSA represented to the board members that it, as a construction
management firm, was able to perform the same functions as a general contractor but for a much
lower cost because construction managers charge flat rates for their projects and require the
landowner to contract with any necessary trade contractors, whereas general contractors inflate
their estimations of how much a project will cost to complete because they must allow for cost
overruns by their own subcontractors. HISD accepted DSA's offer to manage construction of the
school for $2,050,000, and the parties entered a formal, written agreement to that effect.
          Upon completion of the project, HISD complained to DSA about three aspects of the
construction: (1) a poorly-constructed foundation had allowed excess water to collect underneath
the building, causing the ground to swell and damage the under-floor plumbing; (2) the roofing
system that was installed was both inadequate for the weather conditions in Hill County and was
not installed properly, both problems resulting in numerous leaks into the interior of the school;
and (3) the land immediately surrounding the premises was improperly graded, causing rainwater
to flow downward and into the school.
II. LIMITATIONS ON THE DTPA CLAIM
          In its first point of error, DSA contends that HISD's DTPA allegations were barred by the
statute of limitations. It asserts that HISD failed to file its DTPA claims within the two years
allowed under the DTPA's statute of limitations and that, because HISD was aware of the injuries
resulting from DSA's alleged misrepresentations to the district during the contract negotiations
more than two years before filing suit, the discovery rule did not operate to toll the limitations
period. In response, HISD concedes that it did not file suit within two years of DSA's alleged
misrepresentations; however, it asserts that the limitations period was tolled by the discovery rule
because no reasonable person or entity could have discovered, within two years before filing suit,
that the three complained-of injuries were the result of DSA's common scheme to injure HISD.
          DTPA claims are governed by a two-year statute of limitations that the Legislature has
expressly provided may be tolled by the discovery rule. Tex. Bus. & Com. Code Ann. § 17.565
(Vernon 1987); see Burns v. Thomas, 786 S.W.2d 266, 267 (Tex. 1990). Section 17.565 of the
Business Commerce Code reads as follows:
All actions brought under this subchapter must be commenced within two years after the
date on which the false, misleading, or deceptive act or practice occurred or within two
years after the consumer discovered or in the exercise of reasonable diligence should have
discovered the occurrence of the false, misleading, or deceptive act or practice. The
period of limitation provided in this section may be extended for a period of 180 days if
the plaintiff proves that failure timely to commence the action was caused by the
defendant's knowingly engaging in conduct solely calculated to induce the plaintiff to
refrain from or postpone the commencement of the action.

Tex. Bus. & Com. Code Ann. § 17.565.
          The essential facts are not in dispute. The contract was entered into on or about August
22, 1985.


 The school was completed in the fall of 1987 and first occupied in September 1987. 
The original petition was filed on December 29, 1992. Roof-leaking was identified before the
school opened in September 1987. Plumbing damage from the swollen ground underneath the
building was first discovered in either September 1989 or around March 1990. The unsuitable
draining of the land surrounding the school was first noticed in the fall of 1987.
          The first three questions submitted to the jury were whether "[DSA] engage[d] in a false,
misleading, or deceptive act or practice that was a producing cause of damages to Hillsboro
Independent School District"; whether DSA "engage[d] in any unconscionable action or course
of action that was a producing cause of damages to Hillsboro Independent School District"; and
whether "the failure, if any, of [DSA] to comply with a warranty [was] a producing cause of
damages to Hillsboro Independent School District." The jury answered each question in the
affirmative. In question four the jury was asked, "By what date should Hillsboro Independent
School District in the exercise of reasonable diligence, have discovered any of the acts you have
found in answer to Question 1 or 2 or 3[?]" The jury returned the date of July 13, 1992, for each
of the three questions.
          The only evidence in the record relating to a date of July 13, 1992, was a letter from
Johnny M. Tabor of Tabor & Associates, Inc., to Leon Murdoch, English's successor as
superintendent of HISD, concerning the extent of the plumbing and foundation damage caused by
swollen ground underneath the school and by the rainwater that had flowed down and collected
around the building. HISD had previously contracted with Tabor & Associates to conduct a study
of the construction problem with the school and advise the school district on what measures should
be taken to repair the damage that had already occurred and to prevent any further damage from
occurring. The letter constitutes the conclusions Tabor & Associates reached on the best solutions
to remedy HISD's foundation and plumbing problems.
          It is beyond question that if the limitations period was tolled until July 13, 1992, then
HISD's December 29, 1992, original petition was timely. DSA, however, attacks the jury's
finding, contending that the dates upon which HISD undisputedly became aware of the roofing,
plumbing, and landscaping problems control for determining when the discovery rule ceased to
operate and limitations began to run. Moreover, DSA asserts that since the latest date on which
HISD became aware of the roofing and landscaping problems was in the fall of 1987, and the date
the plumbing problems were discovered was around March of 1990, the two-year limitations
period on the DTPA claims had long-since expired by the time HISD filed its December 1992
petition.
          HISD takes a different tack in construing the proper meaning of these undisputed dates,
contending that the dates HISD learned of the injuries which led to this suit are irrelevant in the
determination of when the limitations period began to run. It asserts that the answer properly lies
in determining when it discovered, or should have discovered, not the actual injuries but the
misrepresentations by DSA concerning the nature of its role in the school's construction. And,
because the actions of DSA were part of a pattern of negligence and misrepresentation, the
dispositive date is the one HISD learned of the full extent of the pattern of alleged deceit. HISD
maintains that the jury's finding of July 13, 1992, is unassailable because there is legally and
factually sufficient evidence to support it.
          Several of our sister courts of appeals have addressed a similar issue, and they are
unanimous in holding that the limitations period under section 17.565 begins to run on the date
the putative plaintiff either knew or should have known of the injury that provides the basis of his
DTPA claim. See, e.g., Cornerstones Mun. Util. Dist. v. Monsanto Co., 889 S.W.2d 570, 576
(Tex. App.—Houston [14th Dist.] 1994, writ denied); Foreman v. Pettit Unlimited, Inc., 886
S.W.2d 409, 411 (Tex. App.—Houston [1st Dist.] 1994, no writ); Smith v. Gray, 882 S.W.2d
103, 105 (Tex. App.—Amarillo 1994), writ denied, 907 S.W.2d 444 (Tex. 1995); Hanmore Dev.
Corp. v. JBK Enter., 776 S.W.2d 738, 740 (Tex. App.—Corpus Christi 1989, writ denied). 
HISD's argument that an exception should apply when the physical injuries are tied to a common
scheme is without merit.
          HISD, arguing in the alternative, contends that an exception exists when a fiduciary
relationship exists between the plaintiff and the defendant. HISD maintains that the instant case
is closely akin to Russell v. Campbell, 725 S.W.2d 739 (Tex. App.—Houston [14th Dist.] 1987,
writ ref'd n.r.e.).
          In Russell, the two plaintiffs, former business partners, sued their former accountant for
allegedly misrepresenting to them the nature of a real estate investment partnership in which the
accountant successfully persuaded them to invest. Id. at 742. After luring the plaintiffs into
joining the partnership by assuring them that their 34% interest in the business would be sufficient
to defeat any proposed business maneuvers that they opposed, the plaintiffs agreed to join. Id. 
Over the course of the next several years, however, the accountant proceeded to add further assets
to the business (which six years later had been transformed into a corporation) on his own personal
behalf, and he unilaterally acquired more shareholders for the corporation, both actions having the
effect of diluting the plaintiffs' ownership interest in the corporation to a relatively powerless
22%. Id.
          At trial, the accountant argued that the plaintiffs' negligence, breach of fiduciary duty, and
DTPA claims were barred because the plaintiffs either knew or should have known of the
accountant's representations about the nature of the business in which he had invited the plaintiffs
to invest when the business was incorporated more than four years before the plaintiffs amended
their original petition to add a DTPA claim. Id. at 744. The Fourteenth Court concluded that the
discovery rule tolled the limitations period on each of the plaintiffs' claims and that, as a result,
each of their three causes of action was timely brought. HISD argues that the court reached its
conclusions because of the fiduciary obligations the defendant bore to the plaintiffs.



          Under the DTPA, limitations is tolled until the plaintiff discovers or in the exercise of
reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive
act or practice that leads to the plaintiff filing suit. Tex. Bus. & Com. Code Ann. § 17.565. 
While all plaintiffs are expected to exercise diligence in discovering whether they have been
injured by the putative defendant, when there is a fiduciary relationship between the parties, the
plaintiff is not expected to be as diligent as someone in an arm's-length transaction; in other
words, the diligence expected of the injured party in a fiduciary relationship does not require as
prompt or as searching an inquiry into the conduct of the other party. See Willis v. Maverick, 760
S.W.2d 642, 645 (Tex. 1988); Richard Gill Co. v. Jackson's Landing Owners' Assoc., 758
S.W.2d 921, 924 (Tex. App.—Corpus Christi 1988, writ denied).
          The reasoning behind this "fiduciary duty" concept makes sense in light of the policy of
applying the discovery rule in situations where the putative plaintiff, despite the exercise of due
diligence, could not have discovered the nature of his injury. See Willis, 760 S.W.2d at 645. In
cases like Russell, where the defendant bears a fiduciary relationship toward the plaintiff, the
likelihood of the plaintiff timely discovering his injury is greatly reduced because he reasonably
expects the defendant to fulfill his fiduciary obligations and be truthful and forthright in his
representations. See id. The defendant is often able to take advantage of this fiduciary
relationship to manipulate the trust of those relying on him. The consequence of this trust's
betrayal is a fraud that may continue to go undiscovered for an extended period of time. See
Willis, 760 S.W.2d at 645 (attorney-client fiduciary relationship); Woodbine Elec. Serv., Inc. v.
McReynolds, 837 S.W.2d 258, 262 (Tex. App.—Eastland 1992, no writ); Russell, 725 S.W.2d
at 748.
          The accountant in Russell owed a fiduciary duty to the plaintiffs, and the accountant's
abuse of this trust enabled him to cheat the plaintiffs of their rights first as partners and later as
shareholders in their business. See Russell, 725 S.W.2d at 748. Therefore, the discovery rule
operated to toll the limitations period until the time when the plaintiffs actually discovered the
reason for their injury, even though they may have learned of the nature their injury on an earlier
date.
          While the terms of the agreement were clear that DSA was HISD's agent and, therefore,
DSA was HISD's fiduciary, the facts of the case before us are nevertheless distinctly different
from those in Russell. See Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565, 160
S.W.2d 509, 513 (1942) (agency relationship creates a fiduciary relationship as a matter of law);
Southland Lloyd's Ins. Co. v. Tomberlain, 919 S.W.2d 822, 831 (Tex. App.—Texarkana 1996,
writ denied). Here, HISD was made aware of the injuries it suffered more than two years before
suit was filed. The fiduciary duties DSA owed to HISD did not enable DSA to keep secret the
injuries it may have inflicted upon HISD: the school district was clearly aware of the plumbing,
landscaping, and roofing problems associated with DSA's supervision over the construction of the
elementary school more than two years before suit was filed. Therefore, the existence of a
fiduciary relationship between DSA and HISD did not have the effect of tolling the limitations
period beyond the time HISD became aware of the injuries it suffered. DSA's first point of error
is sustained.
          Due to our disposition of DSA's first point, we need not pass on its second through
fourteenth points, as they all relate to the DTPA cause of action. They are, therefore, dismissed
as moot.
III. LEGAL SUFFICIENCY ON THE BREACH OF CONTRACT CLAIM
          In its eighteenth point of error, DSA complains that the evidence is legally insufficient to
support the trial court's judgment that it breached its contract with HISD. We agree with DSA
on the drainage complaint, but not on either the roofing or plumbing grounds. The relevant
provisions from the agreement are as follows:
1. Upon receipt by DSA from OWNER of the complete and final working drawings, plans
and specifications prepared by OWNER's Architect, DSA shall in OWNER's name and
behalf and as OWNER's Agent, and based on such complete working drawings, plans, and
specifications, secure bids and prices for each category of construction involved, including
labor, materials, specialized skilled services and contractors' services so as to make a final
estimate of cost of construction (included therein the fees of DSA) and shall advise
OWNER of such estimates.
 
2. Upon receipt by DSA from OWNER of OWNER's approval of such final cost estimate
and instruction to DSA to proceed (such instruction to include the date on which OWNER
expects construction to commence), DSA shall then, acting as OWNER's Agent and in
OWNER's name, place and stead, negotiate and prepare contracts for each category of
construction involved, including labor, materials, specialized skilled services and
contractors' services. All such contracts as well as all purchase orders and all change
orders shall be on DSA forms but shall be subject to approval by OWNER and shall be
signed by OWNER, acting by and through the person(s) named in paragraph #19 below. 
It is understood that DSA shall not be responsible for the failure of any laborer,
materialman, specialized skilled service provider, contractor and/or any other contracting
party contracted with or hired under the provisions of this paragraph #2 or paragraph #10
below to perform his, her or its contractual obligations to OWNER under their respective
contracts with OWNER nor for any negligent act, if any, committed by any such laborer,
materialman, specialized skilled service provider, contractor or other contracting party in
the course of the construction project.
 
3. It is expressly recognized and agreed that the relationship between the parties is that of
Principal and Agent. DSA covenants with OWNER to furnish DSA's best skill and
judg[]ment in forwarding the interests of OWNER during the course of the construction
project so as to permit OWNER, insofar as possible, to complete such construction in the
best and soundest way and in the most expeditious and economical manner consistent with
the interests of OWNER. In furtherance of this covenant, DSA, as OWNER's Agent, shall
 
(a) insist upon adequate performance by each laborer, materialman, specialized
skilled service provider, contractor and other contracting party who enters into a
contract with OWNER under the provisions of paragraph #2 above or who is hired
under the provisions of paragraph #10 below of his, her or its contractual
obligations to OWNER, and, if it is determined by DSA that any such laborer,
materialman, specialized skilled service provider, contractor or other contracting
party is not adequately performing such obligations after being called upon to do
so, DSA shall recommend courses of action to OWNER in order that corrective
action may be taken by OWNER;
 
(b) insist upon reasonable compliance by each such laborer, materialman,
specialized skilled service provider, contractor and other contracting party with the
Architect's said final working drawings, plans and specifications for this
construction project, and, if it is determined that there is a failure to comply after
being called upon to do so, DSA shall recommend courses of action to OWNER
in order that corrective action may be taken by OWNER;
 
(c) endeavor to protect OWNER against defects and deficiencies in the work being
performed, and, if deemed appropriate by DSA, recommend courses of action to
OWNER such as, for example, special inspections and/or testings in order that
corrective action may be taken by OWNER.
 
. . .
 
5. For and on behalf of OWNER, DSA, as OWNER's Agent, shall seek out and
secure the services of a Job Superintendent who shall be paid by OWNER for on-the-job supervision and coordination of the work. Such Job Superintendent shall
be a properly qualified full time supervisor who shall be authorized and directed
to report directly and regularly to DSA, as OWNER's Agent, on the progress of
construction and DSA shall evaluate such work progress and advise the OWNER
from time to time of such evaluation. Also, DSA's Project Manager shall regularly
visit the job site and report to the OWNER his evaluation of construction progress
and made recommendations in respect thereof. Owner agrees that when such Job
Superintendent is released by OWNER, OWNER shall execute that certain release
form which shall be furnished by DSA.
 
. . .
 
10. OWNER does not desire that its officers or building committee be burdened with the
day to day hiring and discharge of casual, manual and skilled labor for the subject
construction work. It is, therefore, understood and agreed that its Job Superintendent shall
effect such hiring and discharge of casual, manual and skilled labor, but this delegation of
authority shall not in any manner limit OWNER's right at any time and from time to time
to hire or discharge any labor personnel or its right to establish, approve and disapprove
of labor policies.

          At trial, HISD argued that the plumbing, draining, and roof damage suffered by the school
would not have occurred had DSA performed its contractual duties to make certain (1) that the
school was constructed properly; (2) that a non-expandable filler was used to refill the excavation;
(3) the plumbing was hung further away from the expanding soil underneath; and (4) the exit drain
from the sinkhole was on a higher elevation than the sinkhole, itself. In particular, HISD alleged,
with regard to the plumbing problem, that the plumbing damage would not have occurred had
DSA made certain that the crawl space beneath the building was deep enough to accommodate the
expansion and contraction of the ground below and that non-expandable filler had been used. 
Concerning the excavation, HISD maintained that the drainage problem would not have occurred
had DSA recognized that the grade of the parking lot was improperly designed to permit the flow
of rainwater down to the school building. With regard to the roof, HISD contended that it would
not have leaked had DSA fulfilled its responsibility to make certain that it was a suitable roof for
the building and that it was installed properly.
          When the complaining party raises a point challenging the legal sufficiency of the evidence
to support a finding that favors the party who had the burden of proof on that finding, we must
sustain the finding if, considering only that evidence and the inferences which support the finding,
and disregarding the evidence and the inferences to the contrary, any probative evidence supports
it. American Derringer Corp. v. Bond, 924 S.W.2d 773, 786 (Tex. App.—Waco 1996, no writ);
see Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex. 1993).
a. The Roof
          We disagree with DSA's contentions that there is no evidence to support the jury's findings
that DSA breached its duty to adequately coordinate the installation of the original roof. At trial,
HISD argued that DSA breached the contract by not fulfilling its duty to use its best judgment in
seeing the roof installed, and not fulfilling its duty to make certain the trade contractors did not
perform their work negligently. DSA responds that it could not be responsible for any of the
problems with the roof because (1) the problems with the roof were purely the fault of the design
established by the architecture firm that prepared the blueprints for the school, and (2) assuming
that the trade contractors did perform some of the work negligently, DSA bore no duty to make
certain that it was not. Because we find that there is legally sufficient evidence to support the
jury's finding that DSA breached its duty to use its best judgment in seeing the roof installed, we
will not address the question of whether DSA bore and breached a duty to make certain the roofing
contractor did not perform its work negligently.
          Prior to contacting DSA, HISD hired an architecture firm, Darrow, McSpedden & Sellars,
Inc., (DMSI) to design the school. DMSI's original specifications called for a non-ballasted,



generally flat, elastomeric single-ply membrane roof that was equal to a "Carlisle-manufactured
Sure-Seal Design A, non-ballasted."


 Upon reviewing DMSI's plans, DSA considered that a non-ballasted single-ply flat roof might prove inadequate for the high winds that plague Hill County. 
DSA opined that the winds might catch underneath the roof and pull it away from its moorings,
which would eventually result in substantial leakage. Accordingly, DSA suggested to HISD that
a non-ballasted built-up, or gabled, roof be installed.



          Upon receiving this suggestion, HISD inquired from DMSI whether it desired to substitute
a built-up roof for the non-ballasted, single-ply flat roof that it originally called for in its
specifications. DMSI rejected this suggestion, and HISD instructed DSA to proceed with the
singly-ply, non-ballasted roof.
          Despite DMSI's specifications that a non-ballasted roof be used, DSA then solicited bids
on a ballasted, single-ply roof, and several roofing trade contractors submitted bids based upon
the use of roofs manufactured by several different businesses, including manufacturers referred
to at trial as Carlisle Syn Tech Systems, Firestone Industrial Products Company, and Syenergy
Methods, Incorporated. DSA decided to award the contract to a roofing trade contractor referred
to by the parties as McKenzie & Cross. Upon discovering that McKenzie & Cross's bid was
based upon the installation of a Carlisle-manufactured ballasted, single-ply flat roof instead of a
non-ballasted one and then learning of DMSI's opinion that the walls of the school were not strong
enough to support the extra weight of the ballast, HISD rejected the bid. Nevertheless, DSA
decided to proceed with McKenzie & Cross as the roofing trade contractor, but with McKenzie
& Cross using a Syenergy-manufactured non-ballasted, single-ply roof rather than the ballasted
roof specified in its bid. DMSI subsequently approved the Syenergy roof for the school.
          The basic concept behind this roof was that a metal deck rested over the top of the building
structure and attached to the top of the deck were steel joists. On top of the steel joists lay sheets
of polystyrene insulation boards, and over those, was installed a half-inch thick sheet of wooden
fibre board. On top of the wooden fibre board rested a flexible, elastic membrane. The
membrane covered the entire expanse of the roof and ended along the perimeter at a wall referred
to at trial as a "parapet wall." The parapet wall was an extension of the walls constituting the
perimeter of the building; the parapet wall was designed exclusively for use with the roof's
installation. The height of this parapet wall varied from eight inches to two or three feet. The
membrane was designed to run up the entire height of the parapet wall from its base to the top. 
The deck and membrane were held down mechanically, i.e. by screws, and not by ballast.
          At trial, expert testimony was offered from Vernon Dunagin, a roofing consultant, that the
Syenergy roof was installed negligently. Dunagin testified about a number of mishaps and
omissions that occurred in the roof's installation, including, among other things: (1) the metal deck
upon which the roof's membrane laid was not fastened in every instance to the steel joists
underneath the roof; (2) the mountings for the several skylights installed in the roof were missing
a number of wooden "nailers" that were supposed to hold up the skylights; (3) the insulation
boards underneath the roof were installed with wide gaps between them, which created a potential
for rupture to the membrane should a person unsuspectingly step on a portion of the membrane
covering one of the voids; (4) workers apparently used gasoline to clean parts of the membrane
as it was installed but these workers permitted the gasoline, which has a corrosive effect on
insulation boards, to spill on the boards and deteriorate them; (5) in a similar fashion, the workers
permitted an adhesive they used in the installation of the roof to spill onto the insulation, which
caused further deterioration of it; and (6) insufficient adhesive was used along the edge of the
membrane where the membrane was installed to run up the parapet wall, which allowed the
membrane to pull apart at the seams.
          DSA's defense to all these instances where the roof was allegedly installed negligently was
that only the roofing contractor, McKenzie & Cross, and perhaps the roof's manufacturer,
Syenergy, could be held liable to HISD under the agreement. DSA referred to the disclaimer of
liability clause located in paragraph two:
It is understood that DSA shall not be responsible for the failure of any laborer,
materialman, specialized skilled service provider, contractor and/or any other contracting
party contracted with or hired under the provisions of this paragraph #2 or paragraph #10
below to perform his, her or its contractual obligations to OWNER under their respective
contracts with OWNER nor for any negligent act, if any, committed by any such laborer,
materialman, specialized skilled service provider, contractor or other contracting party in
the course of the construction project.

In disposing of this point of error insofar as it relates to the roofing allegations, we need not
consider, generally, whether DSA was able to insulate itself from liability under the contract in
every instance where McKenzie & Cross, as a "service provider" under paragraph 2, performed
its duties negligently. Instead, we find that there is "some evidence" that DSA breached its duty
under paragraph 3 of the contract to "furnish DSA's best skill and judg[]ment in forwarding the
interests of OWNER during the course of the construction project so as to permit OWNER,
insofar as possible, to complete such construction in the best and soundest way and in the most
expeditious and economical manner consistent with the interests of OWNER."
          As indicated above, DMSI's original specifications for the roof called for a roof
comparable in quality to the Carlisle-manufactured elastomeric single-ply membrane roof. In the
course of receiving bids from various roofing trade contractors on the job, McKenzie & Cross in
its bid indicated that it would perform the job using a ballasted Carlisle-manufactured elastomeric
single-ply membrane roof. DSA then learned from HISD that it did not want a ballasted roof;
nevertheless, DSA inquired from McKenzie & Cross whether it could perform the job using a non-ballasted roof. McKenzie & Cross responded that it would use a Syenergy-manufactured non-ballasted roof, and DSA agreed to proceed with McKenzie & Cross as the roofing trade-contractor
on this basis.
          Evidence was admitted at trial from Vernon Dunagin that a Syenergy roof was
inappropriate for the high-winds of Hill County. As indicated above, the record indicates that the
Syenergy roof was designed to end, and then run up the entire length of, the parapet wall. 
According to Dunagin, all the manufacturers of single-ply roofs of which he is aware specify that
a "termination bar" be situated at the base of the parapet wall. Implied in Dunagin's comments
is the assertion that the termination bar is used to secure the membrane against the bottom of the
parapet wall. Dunagin testified that, when the membrane becomes detached from the bottom of
the parapet wall, wind will catch underneath the membrane, causing it to flap up, which creates
voids that pull on the seams, weakening them.
          According to Dunagin, the membrane of the Syenergy roof was designed to be attached to
the parapet wall only by using glue. Through Dunagin, evidence was offered that, due to the lack
of a termination bar, the membrane pulled away from the parapet wall and helped cause the leaks
about which HISD complained. We hold that DSA's recommendation to HISD that it use the
Syenergy roof, which by design lacked a termination bar, was some evidence that DSA breached
its duty to HISD under paragraph 3 of the contract.
          DSA asserts that all non-ballasted, single-ply roofs would fail on this school and that,
therefore, it cannot be held responsible for suggesting that one particular type of non-ballasted,
singly-ply roof, namely, the Syenergy roof, be used. It also contends that, had HISD used a built-up roof as it had originally suggested and has since been installed on the school, the roof problems
would never have occurred. Dunagin, however, testified that non-ballasted, single-ply roofs built
by manufacturers other than Syenergy would have been appropriate for the school. Therefore,
there is some evidence to defeat DSA's argument.
          DSA argues that it is not a roofing expert and therefore could not be expected to provide
expert opinions to HISD on the quality of various roofs. However, DSA must take some
responsibility for persuading HISD to use a roof that was different than what DMSI's original
specifications called for. The record is clear that DMSI subsequently approved DSA's suggestion
that McKenzie & Cross be hired for the job using a Syenergy roof, but DMSI's "stamp of
approval" on DSA's suggestion does not cleanse DSA of all responsibility for its actions. DMSI
may have been negligent in approving the Syenergy roof, but that does not absolve DSA of its
responsibility to make certain that its recommendations for changes in the school's specifications
are made reasonably.
          Deposition testimony from Francis BeVier, DSA's project manager for the construction
of the school, was offered at trial wherein he conceded that DSA did no investigation into the
strength of Syenergy-manufactured roofs. Instead, DSA deferred absolutely to McKenzie & Cross
on what kind of roof to use, and because McKenzie & Cross wanted to use a Syenergy-manufactured roof, DSA went along with the suggestion and made the recommendation to HISD. 
DSA's failure to investigate the strength of Syenergy-manufactured roofs before recommending
to DMSI that one be used in lieu of a Carlisle-calibre roof is some evidence that DSA breached
its contractual duty to HISD.
          DSA defends itself by arguing that DSA was merely following a directive from DMSI to
try to consider lesser-expensive alternatives in putting on the roof when it decided to recommend
that the Syenergy-manufactured roof be used. This directive from DMSI, however, does not
justify DSA's using a substandard-quality roof. Therefore, there is some evidence to support the
jury's finding that DSA breached its contractual obligations to HISD in overseeing the construction
of the roof. 
b. The Plumbing
          The evidence adduced at trial is legally sufficient to support the judgment that DSA
breached its agreement with HISD with regard to the plumbing problems. The evidence at trial
was uncontroverted that DMSI's original design of the school specified that a pier-and-beam
foundation would be used with a single "sinkhole" to be located underneath the center of the
building through which excess water could drain. The record indicates, roughly, that in a pier-and-beam foundation, piers are driven to a level deep enough in the ground where the amount of
moisture level of the soil is so minimal that it could not cause any significant expansion or
contraction of either the soil or the piers. Once the piers are set at this level, beams are then
connected across the piers and the building is constructed thereon. With a building constructed
using a pier-and-beam foundation, a crawl space is dug underneath the building and in that crawl
space the plumbing is hung from the bottom of the building.
          In its brief, DSA alleges that any problems with water collecting under the school was due
to HISD's insistence on using the pier-and-beam foundation and that this foundation, coupled with
the sinkhole, was woefully inappropriate for the school. DSA maintains, therefore, that any
problems with improper drainage can only be attributed to this faulty design that it, under its
agreement with HISD, was obliged to follow. We agree with DSA that it was obliged to follow
DMSI's specifications, whether those specifications concerned the plumbing, the roofing, the
excavation, or any other aspect of the school's construction.


 
          Paragraph one of the agreement clearly provides that DSA was to commence its work on
the project "[u]pon receipt by DSA from OWNER of the complete and final working drawings,
plans and specifications prepared by OWNER's Architect", and paragraph 3 clearly provides that
DSA shall "insist upon reasonable compliance by each such laborer, materialman, specialized
skilled service provider, contractor and other contracting party with the Architect's said final
working drawings, plans and specifications[.]" The direct implication from these statements is that
DSA was to follow the specifications of DMSI to see that DMSI's design of the proposed school
was implemented. The testimony from the several witnesses at trial further substantiates this
theory of the case. Dr. Roy B. Young, a veterinarian in Hillsboro who was a member of the
HISD school board at the time of the school's construction and was president of the board at the
time of trial, testified that during the contract negotiations DSA offered to have its own in-house
architect design the building. According to Dr. Young, HISD responded that it had already
obtained a design for the building from DMSI and that it wished its design to be followed. HISD
also offered that DMSI would continue to oversee the construction of the school so that any
necessary changes in the design of the school, discovered during the construction process, could
take place. Therefore, given the clear instructions that DSA was merely to follow the design of
the school as provided by DMSI, there could have been no expectation on the part of HISD that
DSA would either correct any flaws in the design of the school


 or override any specifications in
the design with which DSA might have disagreed.
          Unlike HISD's allegations concerning the roof, there is no evidence that DSA was
somehow at fault in selecting the type of foundation to be used. We thus turn to the question of
whether DSA otherwise failed to comply with the terms of the agreement.
          DSA defends itself against HISD's accusations that the foundation was negligently
constructed by asserting (1) it bore no duty under the contract to make certain that the trade
contractor who constructed the foundation did not perform his work negligently, and (2) that the
pier-and-beam foundation was doomed to fail no matter how it was built. DSA's arguments are
without merit.
          The agreement between the parties clearly provided that DSA was to obtain trade
contractors for the completion of the several areas of the school's construction, including the
excavation and foundation. DSA did that. It located a business referred to at trial as Hillsboro
Sand and Gravel (hereafter HS&G) to excavate the land and build a foundation for the school. A
second trade contractor was hired to install the plumbing. Four problems apparently arose from
the manner in which HS&G constructed the foundation: (1) HS&G was negligent in not providing
sufficient clearance in the crawl space for the ground to expand without coming into contact with
the plumbing located underneath the building, (2) HS&G was negligent in failing to use "select
fill," a type of soil that does not expand when wet, to refill the excavation, (3) the plumbing
contractor was negligent in not hanging the plumbing high enough to avoid the expanding ground,
(4) HS&G was negligent in not constructing the exit drain at a lower elevation than the sinkhole,
and (5) HS&G was negligent in placing the drain for the sinkhole higher than the surrounding
ground. At trial HISD sought to attribute, at least in part, the blame for both the faulty design and
the negligent construction of the foundation to DSA.
          DSA maintains that it cannot be held responsible for these negligent acts of HS&G and the
plumbing trade contractor because it had no obligation under the contract to make certain that
these trade contractors did not perform their duties negligently.
          The DSA-HISD agreement provides that "DSA shall not be responsible for the failure of
any laborer, materialman, specialized skilled service provider, contractor and/or any other
contracting party contracted with or hired under the provisions of this [agreement] to perform his,
her or its contractual obligations to OWNER under their respective contracts with OWNER nor
for any negligent act, if any, committed by any such laborer, materialman, specialized skilled
service provider, contractor or other contracting party in the course of the construction project."
          However, the agreement also unequivocally imposes on DSA a duty to "insist upon
adequate performance by each laborer, materialman, specialized skilled service provider,
contractor and other contracting party" who enters into a contract with DSA.
          DSA essentially contends that it cannot be held liable for any negligence practiced by any
of the trade contractors because of the waiver-of-liability clause quoted above. But this clause
does not excuse DSA from fulfilling its duty to "insist upon adequate performance" by the several
trade contractors.
          Paragraph 4 of the agreement provided that DSA was to hire a job superintendent to
oversee the day-to-day construction operations at the job site. The agreement also provided that
the project manager was required to monitor the progress of the school's construction. BeVier,
DSA's project manager, however, testified that no one from DSA made an effort to inspect every
element of the school's construction. Evidence that BeVier and the job superintendent failed to
conduct these inspections supports the finding that DSA breached the contract.
          Assuming that it did bear this duty, DSA nevertheless argues that the trade contractors
were not negligent and that they constructed the building according to DMSI's specifications.
          The record reveals that DMSI called for a one-foot crawl space underneath the school. In
that crawl space the plumbing was designed to hang, at the least, four inches below the school. 
BeVier testified that he was aware at the time of construction that the ground around the school
had the potential to expand, when wet, from four to ten inches. As might be expected, when
heavy rains came, the ground underneath the school expanded greatly and crushed the plumbing. 
HISD maintains that, as BeVier was aware that more clearance was needed underneath the school
than was provided by HS&G, then DSA necessarily breached its contractual duties to make certain
that the crawl space was not negligently constructed.
          There is no evidence that the crawl space was negligently constructed. The height of the
crawl space was mandated by DMSI in the specifications it provided for the construction of the
school. DSA and HS&G abided by these specifications. Under the agreement, DSA had an
obligation to report to HISD instances when the trade contractors were performing their duties
negligently, at least at the times when DSA was aware of negligent performance. It was not a part
of HS&G's duties, however, to make certain that there was sufficient clearance in the crawl space
for both the plumbing and the expanded soil. Therefore, DSA could not have failed to carry out
its contractual duties to make certain that HS&G was not acting negligently in constructing the
foundation and crawl space.
          Similarly, DSA could not have been responsible for any negligence that may have been
conducted in hanging the plumbing beneath the school. According to DMSI's specifications, the
plumbing, no matter how high it was hung, was going to encounter the expanded soil. Therefore,
any error with regard to the depth at which the plumbing was hung can only be attributed to
DMSI.
          There is some evidence in the record, however, to support the other alleged instances of
neglect. We have examined the record and find no evidence that the inlet was designed by DMSI
to be higher than the surrounding ground or that the exit point for the drainage pipe was designed
by DMSI to be higher than the sink hole. The specifications indicate that soil from the excavation
site may be used to refill the excavation, but there is also evidence, from Dr. Young's testimony,
that select fill was supposed to be used around the plumbing to prevent the soil from expanding
into it. The conclusion necessarily follows from this evidence that the shortcomings in the
construction of the school could very well have been the result of the negligence of one of the
trade contractors involved in that particular area of the construction.
          Thus, the fact that neither DSA's job superintendent, BeVier, nor any other representative
made a sufficient effort to identify the plain errors of the trade contractors in making the sinkhole
drain level to the surrounding grounds and in not using select fill, failed to make certain that water
in the sink hole would be able to flow downward to an exit point is some evidence to support the
jury's finding that DSA had breached its duty under the agreement.
          Again arguing in the alternative, DSA asserts that any conclusion by this court that it
breached its duty to make certain the several trade contractors performed their duties reasonably
is irrelevant given DSA's position that the pier-and-beam foundation was doomed to fail. They
maintain that HISD and DMSI are the only blameworthy parties for the plumbing problems
because they refused to follow DSA's recommendation that a concrete slab foundation be used
instead of the pier-and-beam.
          In support of its argument, DSA identifies two reasons why the pier-and-beam foundation
should not have been used:


 first, the tremendous expansiveness of the soil in Hill County, due to
its heavy clay content,


 meant that the ground could easily expand to the point that the plumbing
underneath the school would be damaged; and second, the amount of water that would collect
under the school in severe rainstorms could not be adequately dispatched away from the building
and out of harm's way by a single sinkhole.


 DSA maintains that it suggested two alternatives
to HISD that would have resolved the problems with both the pier-and-beam foundation and the
sinkhole. First, the pier-and-beam foundation design should have been replaced by a concrete slab
foundation; and second, assuming that the pier-and-beam foundation would have been used
anyway, an alternative drainage system should have been used instead of a sinkhole. HISD
rejected both of these suggestions, preferring to proceed with the pier-and-beam foundation along
with a single sinkhole drain underneath the school.
          The record reveals that once the problem with the damaged plumbing was discovered, a
plumber was hired by HISD to repair the damage. Upon this plumber's recommendation, the
depth of the crawl space was increased in certain areas, and all of the plumbing was hung higher
than it had been previously. The soil in the crawl space was also resloped to permit the more
expedient flow of water into the single drain hole. The area surrounding the school was similarly
regraded to permit the flow of rainwater away from the school instead of underneath it. With
these adjustments, no further damage has been done to the school despite the continued expansion
and contraction of the soil underneath the school.


 Therefore, we conclude that there is some
evidence in the record that the pier-and-beam foundation with a single sinkhole design could
effectively provide for the adequate dispatch of excess rainwater's entering beneath the school.
c. The Excavation of the Parking Lots
          With regard to the improper draining of the parking lots, DSA saw that they were graded
according to the specifications of DMSI. HISD argues that DSA was negligent in permitting the
parking lots to be built in a fashion that would allow rainwater to flow directly toward the front
door of the school. However, as we indicated in the above discussion concerning the problems
with the plumbing, DSA was under no contractual obligation to make certain that structural or
design problems did not occur. Its obligation was only to make certain that the work was
"adequately performed" according to DMSI's design. The evidence from trial is conclusive that
the improper draining of the parking lots was due solely to the grade provided by DMSI, not
because of any negligent construction of the parking lots.
          HISD also maintains that the reason for the improper drainage was that DSA failed to see
that lime-stabilizing soil was placed over the ground before the parking lots were covered with
asphalt. But DMSI's specifications did not call for the stabilization of the soil before applying
asphalt. DSA was under no contractual obligation to alter the specifications of DMSI. 
Accordingly, we conclude that there is no evidence to support the jury's finding that DSA
breached its contractual duties to HISD with respect to the construction of the parking lots.
          Point of error eighteen is sustained in part and overruled in part.
IV. WHETHER THE TORT CLAIMS SOUND ONLY IN BREACH OF CONTRACT
          In its seventeenth point of error, DSA complains that the portion of the judgment relating
to both HISD's DTPA and negligent misrepresentation causes of action should be reversed and
rendered because HISD's causes of action sounded solely in breach of contract, not tort. As we
will reverse and render judgment for DSA on the DTPA cause of action on limitations grounds,
we will consider this point of error only as it relates to the negligent misrepresentation claim.
          DSA relies primarily upon the Supreme Court's recent opinion in Crawford v. Ace Sign,
Inc., 917 S.W.2d 12 (Tex. 1996), to support its argument. In Crawford, the court considered
whether a telephone book publishing company could be liable both under the DTPA and for breach
of contract when it failed to publish an advertisement as properly agreed to by the parties. Id. at
12-13. In analyzing the issue the court quoted with approval its earlier language in Ashford Dev.,
Inc. v. USLife Real Estate Serv. Corp., 661 S.W.2d 933, 935 (Tex. 1983), that "[a]n allegation
of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive
act' in violation of the DTPA." Crawford, 917 S.W.2d at 14 (quoting Ashford Dev., 661 S.W.2d
at 935). The court then found that the publishing company had made no fraudulent or deceptive
statements to the plaintiff, that it had merely failed to perform its duties under the contract. 
Crawford, 917 S.W.2d at 14-15. Therefore, held the court, the plaintiff's cause of action sounded
only in breach of contract. Id. at 15.
          In the instant case, however, HISD's negligent misrepresentation cause of action was
dependent upon representations that DSA's employees made during the contract negotiations. By
these representations, DSA allegedly promised to carry out its contractual duties above-and-beyond
what was later indicated in the contract. It is because DSA allegedly failed to perform these duties
as represented by DSA during the contract negotiations that HISD decided to bring its cause of
action for negligent misrepresentation. These allegations are separate and apart from the breach
of contract allegations. Therefore, we conclude that HISD's negligent misrepresentation cause of
action is not merely a breach of contract claim. See Howell Crude Oil Co. v. Donna Refinery
Partners, Ltd., 928 S.W.2d 100, 109 (Tex. App.—Houston [14th Dist.] 1996, writ filed);
Decision Control Sys., Inc. v. Personnel Cost Control, Inc., 787 S.W.2d 98, 100-01 (Tex.
App.—Dallas 1990, no writ). DSA's seventeenth point is overruled.
V. SUFFICIENCY OF THE EVIDENCE ON THE ROOF DAMAGES
          In its nineteenth point of error, DSA argues that the evidence is legally insufficient, or in
the alternative factually insufficient, to support the jury's finding that HISD suffered $170,000 in
damages for the roof. The only evidence at trial concerning the amount of damages for the roof
was $168,661.73 to replace the roof and $921.60 to replace ceiling tiles that had been damaged
by rainwater leaking through the roof. The sum of these two figures is $169,583.33, or $416.67
less than the amount of damages awarded under the breach of contract cause of action for the roof. 
Therefore, we order a remittitur of $416.67. See Tacon Mechanical Contractors, Inc. v. Grant
Sheet Metal, Inc., 889 S.W.2d 666, 670 (Tex. App.—Houston [14th Dist.] 1994, writ denied)
(non-breaching party is entitled to all its actual damages necessary to put it in same position had
contract not been breached); see also Kiewit Texas Mining Co. v. Inglish, 865 S.W.2d 240, 245
(Tex. App.—Waco 1993, writ denied). DSA's nineteenth point of error is sustained in part.
VI. SUFFICIENCY OF THE EVIDENCE
ON THE NEGLIGENT MISREPRESENTATION CLAIM

          DSA, in its twenty-first point of error, complains that the evidence is legally, or
alternatively, factually, insufficient to support the jury's finding of liability on the negligent
misrepresentation cause of action.
          The elements of a cause of action for the breach of this duty are: (1) the representation is
made by a defendant in the course of his business, or in a transaction in which he has a pecuniary
interest; (2) the defendant supplies "false information" for the guidance of others in their business;
(3) the defendant did not exercise reasonable care or competence in obtaining or communicating
the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the
representation. Federal Land Bank Assoc. of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991);
see also Restatement (Second) of Torts § 552 (1977). In reviewing a factual sufficiency
point, the court of appeals must weigh all of the evidence in the record, both favorable and
unfavorable to the judgment. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); TCA Bldg. Co.
v. Northwestern Resources Co., 922 S.W.2d 629, 638 (Tex. App.—Waco 1996, writ denied). The
findings of the trier of fact may be overturned only if they are so against the great weight and
preponderance of the evidence as to be clearly wrong and unjust. Ortiz, 917 S.W.2d at 772; TCA
Bldg. Co., 922 S.W.2d at 638. As indicated above in our discussion of the breach of contract
issue, the evidence is legally sufficient to support the judgment if, after considering only that
evidence and the inferences which support the finding in the light most favorable to the judgment,
there is some probative evidence to support it. American Derringer, 924 S.W.2d at 786; see
Browning-Ferris, 865 S.W.2d at 928.
          Evidence was adduced at trial from Dr. Young that various representatives from DSA told
the school board members that "they had all the expertise that anyone could need in building an
elementary school, and that [HISD] had no need to look any further than DSA to obtain what
[HISD] needed." These representatives further indicated that the building would be of "number
one quality," that it would be "a lasting building," and that if any problems arose post-construction
that they would "stick with [HISD] . . . [to] see that it was remedied[,] whatever it took." 
According to Dr. Young, DSA represented that it would operate in the same manner as a general
contractor.
          A general contractor, however, generally warranties every element of a building's
construction and warrants that he will remedy any problems that should become apparent either
during or after the construction is completed. Therefore, there is legally sufficient evidence that
DSA, by representing to the school board that it would operate as a general contractor and then
subsequently failing to operate as such, made a negligent misrepresentation to HISD.
          With regard to DSA's factual sufficiency challenge, we have weighed the evidence and
determined that the jury's finding was not so against the great weight and preponderance of the
evidence as to be manifestly wrong or unjust. Ellis County State Bank v. Keever, 888 S.W.2d
790, 794 (Tex. 1994) (court of appeals is not required to give details supporting evidence when
affirming factual sufficiency of the evidence underlying trial court judgment). DSA's twenty-first
point of error is overruled.
VII. WHETHER A COMPARATIVE NEGLIGENCE CHARGE SHOULD HAVE
BEEN GIVEN ON THE NEGLIGENT MISREPRESENTATION CLAIM

          In its twentieth and final point of error, DSA complains that the trial court erred in failing
to submit a comparative negligence charge on HISD's negligent misrepresentation claim.
          The authority on the issue of whether a defendant is entitled to a jury charge on
comparative negligence in response to a negligent misrepresentation claim is sparse. Indeed, we
are aware of only one appellate opinion that even addresses the issue. In Federal Land Bank
Assoc. of Tyler v. Sloane, 793 S.W.2d 692, 696 n.4 (Tex. App.—Tyler 1990), aff'd in part and
rev'd in part on other grounds, 825 S.W.2d 439 (Tex. 1991), the Tyler Court of Appeals in a
footnote stated presumptively and without any analysis that "[c]ontributory negligence is a defense
to the cause of action for negligent misrepresentation." As its authority, the Tyler court cited
section 552A of the Second Restatement of Torts. Id. (citing Restatement (Second) of Torts,
§ 552A (1977)).
          Most of the jurisdictions that have addressed the question have determined that a defendant
to a negligent misrepresentation cause of action, upon a showing of some evidence, is entitled to
a contributory or comparative negligence jury charge. See Sonja Larsen, Annotation, Applicability
of Comparative Negligence Doctrine to Actions Based on Negligent Misrepresentation, 22
A.L.R.5th 464 (1994); see also, e.g., Williams Ford, Inc. v. Hartford Courant Co., 657 A.2d 212
(Conn. 1995); Wegad v. Howard Street Jewelers, Inc., 605 A.2d 123 (Md. 1992); Silva v.
Stevens, 589 A.2d 852 (Vt. 1991); Gurnsey v. Conklin Co., Inc., 751 P.2d 151 (Mont. 1988);
Florenzano v. Olson, 387 N.W.2d 168 (Minn. 1986); Darner Motor Sales, Inc. v. Universal
Underwriters Ins. Co., 682 P.2d 388 (Ariz. 1984); H. Rosenblum, Inc. v. Adler, 461 A.2d 138
(N.J. 1983); Christenson v. Commonwealth Land Title Ins. Co., 666 P.2d 302 (Utah 1983). The
rationale for this view rests on the notion that there is no reason to differentiate negligent
misrepresentations from any other forms of negligence and, therefore, the ordinary rules as to
comparative or contributory negligence should apply. Larsen, 22 A.L.R.5th at 471.
          Several jurisdictions, however, have concluded that a party who misrepresents facts to
another while reasonably expecting that party to rely upon those facts should not be permitted to
benefit from a comparative negligence instruction. See, e.g., Estate of Braswell v. People's Credit
Union, 602 A.2d 510 (R.I. 1992); Wilson v. Came, 366 A.2d 474 (N.H. 1976); Carroll v. Gava,
159 Cal.Rptr. 778 (Cal. App. 1979). Rationales for the minority position include a desire to avoid
chaos in the jury room when the jurors attempt to allocate the amount of negligence attributable
to the parties; a concern that a contributory or comparative negligence charge would be redundant
because an element of a negligent misrepresentation cause of action is that the plaintiff justifiably
rely upon the misrepresentation; a recognition that business ethics require parties to be truthful in
their factual representations, which justifies placing the entirety of the blame on the defendant; and
an expectation that by introducing comparative negligence as a defense to negligent
misrepresentation one would undermine the very purpose of a negligent misrepresentation cause
of action, that being consumer protection. See Larsen, 22 A.L.R.5th at 471-72.
          We, however, will overrule DSA's twentieth point of error because it was not preserved
for our review. See Tex. R. App. P. 52(a). The record reveals that the question DSA submitted
on the comparative negligence issue asked what percentage of the negligence that caused the roof
and foundation damage could be attributed to DMSI, DSA, HISD, McKenzie & Cross, and two
other trade contractors. The trial court refused to give the charge.
          To preserve a complaint about the jury charge, a party must make a timely and specific
objection, or request, and obtain a ruling. See Tex. R. App. P. 52(a); Tex. R. Civ. P. 274; State
Dep't of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 240 (Tex. 1992) (on rehearing). 
The charge requested by DSA would have asked the jury to apportion the amount of negligence
each of the listed defendants committed in causing damage to the roof and foundation. The record
is clear that, at trial, DSA argued that it had no duty to make certain that the several trade
contractors used by DSA in constructing the school performed their duties reasonably. In the
alternative, should the court decide that DSA did bear this duty, DSA contended that it should not
be held entirely responsible for the negligent construction but that the several trade contractors
should share in the blame.
          The charge requested by DSA is ambiguous. It could very well be read as applying only
to this defensive theory of the case and not at all to HISD's negligent misrepresentation cause of
action. Due to this ambiguity in the request, we conclude that DSA failed to meet its duty of
providing the trial court with a sufficiently specific objection, by means of a request, to the jury
charge. See Castleberry v. Branscum, 721 S.W.2d 270, 277 (Tex. 1986). Therefore, DSA failed
to preserve its complaint for our review, and its twentieth point of error is overruled.
VIII. SUFFICIENCY OF THE EVIDENCE ON GROSS NEGLIGENCE
          In its fifteenth and sixteenth points of error, DSA contends the evidence is legally and
factually insufficient to support the jury's findings that DSA had acted with gross negligence. As
we reversed and rendered judgment in favor of DSA on the DTPA allegations, the only ground
upon which the gross negligence findings may stand is the negligent misrepresentation cause of
action.
          At the time of trial, "gross negligence" was defined in the Civil Practice and Remedies
Code as "more than momentary thoughtlessness, inadvertence or error in judgment."


 It meant
an entire want of care as to establish that the act or omission was the result of conscious
indifference to the rights, safety, or welfare of the person affected. Act of June 16, 1987, 70th
Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 44 (formerly codified at Tex. Civ. Prac. &
Rem. Code Ann. § 41.001(5)). The Supreme Court in Transportation Ins. Co. v. Moriel, 879
S.W.2d 10 (Tex. 1994), found two components to this statutory definition: (1) the defendant's act
or omission, and (2) the defendant's mental state. Id. at 23; Strahan v. Davis, 872 S.W.2d 828,
834 (Tex. App.—Waco 1994, writ denied). To constitute gross negligence, (1) the act or
omission, viewed objectively from the standpoint of the actor, must involve an extreme degree of
risk, considering the probability and magnitude of the potential harm to others, and (2), with
regard to the defendant's mental state, he must have actual, subjective awareness of the risk
involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of
others. Moriel, 879 S.W.2d at 23; Strahan, 872 S.W.2d at 834.
a. Extreme Degree of Risk of Harm
          The "extreme degree of risk of harm" factor is a significantly higher standard than the
"reasonable person" test for ordinary negligence. Moriel, 879 S.W.2d at 22; Convalescent
Services, Inc. v. Schultz, 921 S.W.2d 731, 735 (Tex. App.—Houston [14th Dist.] 1996, writ
denied); Strahan, 872 S.W.2d at 835. The risk created by the defendant's conduct must have been
so extreme as to have created the "likelihood of serious injury" to the person affected. Universal
Services Co. v. Ung, 904 S.W.2d 638, 642 (Tex. 1995); Moriel, 879 S.W.2d at 22; Schultz, 921
S.W.2d at 735; Strahan, 879 S.W.2d at 835. The extreme risk prong is not satisfied by a remote
possibility of injury or even a high probability of minor harm, but rather it requires the likelihood
of serious injury to the plaintiff. Ung, 904 S.W.2d at 641; Moriel, 879 S.W.2d at 22; Schultz,
921 S.W.2d at 735; Strahan, 879 S.W.2d at 835. Extreme risk of harm is a function of both the
magnitude and the probability of the anticipated injury to the plaintiff. Ung, 904 S.W.2d at 641;
Moriel, 879 S.W.2d at 22; Schultz, 921 S.W.2d at 735; Strahan, 879 S.W.2d at 835. We analyze
the events and circumstances surrounding the issue from the defendant's perspective at the time
the tort occurred without resorting to hindsight. Moriel, 879 S.W.2d at 23; see Schultz, 921
S.W.2d at 735.
          Evidence was adduced at trial that DSA represented to HISD that it would perform its
duties in the same manner as a general contractor and that it would oversee the construction of the
school and make certain that the several trade contractors involved performed their various duties
reasonably. DSA informed HISD that, upon completion, it would have a first-rate school and that
DSA would take whatever steps that would be necessary to repair any defects. Based upon these
representations, HISD entered into its contract with DSA, believing that it would obtain a safe and
solid school for its students.
          Throughout the time of the construction, DSA did not make certain either that the materials
used in the construction were sufficient for the job or that the construction was performed
properly. Even before construction began, DSA had persuaded HISD to use a type of roof that
was not in accordance with the specifications of DMSI. The record reveals that DSA's
malfeasance and nonfeasance were the proximate cause of at least two serious problems in the
school's construction, that of the leaky roof and the damaged plumbing. The leaks from the roof
saturated the ceiling tiles so thoroughly that some of them became so weakened that they fell to
the floor inside the building. With elementary school-aged children attending classes, the potential
for injury to those children was great. The evidence at trial revealed that the burst plumbing
caused the spillage of sewage, and sewage emits methane gas, a toxic substance. While the
methane gas may not have presented a serious danger to the adults in the building, the grade
school-aged children were more susceptible to injury.
          The record thus contains evidence that DSA's actions created a risk of serious injury. The
question remains, however, whether there was a "likelihood" of serious injury. By not overseeing
the construction progress in the manner that it had indicated to HISD that it would, DSA left open
the possibility that any one of the trade contractors might perform its duties negligently. Many
of the elements of a building's construction, if performed negligently, could result in serious
bodily injury. For instance, improperly installed wiring may result in a deadly fire, a negligently
constructed foundation could cause a building to collapse with fatal consequences, or a carelessly
assembled roof may mortally wound someone when it comes crashing to the floor. Any one of
these injuries could have occurred as a result of DSA's lack of supervision of the school's
construction. Moreover, the evidence is legally and factually sufficient to support the jury's
implied finding that one of these types of injuries was likely to occur given DSA's stark lack of
supervision over the project.
b. Actual Subjective Knowledge
          There also is legally and factually sufficient evidence in the record to support the jury's
implied finding that DSA, at the time of its negligent misrepresentation, possessed "subjective
awareness of the risk[s] involved, but nevertheless proceed[ed] in conscious indifference to the
rights, safety, or welfare of others." Moriel, 879 S.W.2d at 20; Strahan, 872 S.W.2d at 834. In
considering the intent prong of Moriel, we analyze whether the defendant, although not actually
intending to cause harm, nevertheless proceeded with knowledge that harm was a highly probable
consequence. See Schultz, 921 S.W.2d at 737. The defendant's subjective mental state may be
proven by direct or circumstantial evidence. Moriel, 879 S.W.2d at 23.
          The evidence indicates that DSA has been in the construction management business since
it first opened its doors in 1966. BeVier testified that he had been working with DSA since 1986
or 1987. Testimony was offered from several witnesses that DSA had substantial experience in
constructing schools, churches, and other buildings. BeVier further testified that he was aware
of the differences between general contractors and construction managers. BeVier understood that
in a construction manager relationship, the owner of the building to be constructed must look to
the several trade contractors hired by the construction manager should a part of the construction
be performed negligently. Thus, BeVier was aware that the nature of the construction manager
relationship requires the owner to take an active interest in making certain that the trade
contractors are performing their work reasonably and soundly. By failing to undertake this
responsibility, the owner runs a tremendous risk that various portions of the construction, perhaps
crucial portions, could be completed negligently and the whole building could wind up a disaster.
          DSA, however, represented to HISD that it would perform the same functions as a general
contractor but for a lot less money. DSA went so far as to agree in its contract with HISD to
provide two representatives, a project manager and a job superintendent, who would oversee the
construction and compel the several trade contractors to perform their duties reasonably. DSA,
nevertheless, failed to perform these duties, and moreover, there is evidence in the record that it
never intended to perform these duties.
          With regard to the plumbing, DSA admitted that it did nothing to make certain that the
plumbing was installed properly. No one checked to see that the drain for the sink hole was level
with the surrounding ground or that the exit drain was lower than the actual sinkhole. Concerning
the roof, BeVier admitted that no one checked into the quality of the Syenergy-manufactured
singly-ply, non-ballasted roof to see whether it was of the same quality as what DMSI had ordered
in its specifications. DSA knew of the potential dangers of remaining so aloof in performing its
duties under the agreement, yet it did nothing to become more involved in the school's
construction.
          DSA argues that it could not have been grossly negligent given the several instances in
which it made suggestions to HISD for how the design of the school could be changed for the
better. These instances, however, are insufficient to overcome the abundant evidence that DSA
told HISD that it would make certain that every element of the construction was performed
adequately but then did very little to follow up on these promises.
          Therefore, given the recklessness with which DSA made its promises to HISD, the severe
risk of harm that DSA knew was a likely result of its actions, and the recognition by DSA of the
risk involved in performing its functions as a construction manager while permitting HISD to
believe it would act as a general contractor, we conclude the evidence is legally and factually
sufficient to support the jury's findings on gross negligence. DSA's fifteenth and sixteenth points
are overruled.
          The judgment is reformed to provide that HISD recover $220,244.33 in actual damages,
$170,000 in exemplary damages, attorneys' fees as provided therein, prejudgment interest at 10%
compounded annually from June 19, 1993, until July 3, 1995, and postjudgment interest at 10%
per annum from July 3, 1995, until paid.


                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Chief Justice Davis,
          Justice Cummings, and
          Justice Vance
Judgment reformed and affirmed
Opinion delivered and filed April 23, 1997
Do not publish Released for publication under former Rule 90(h) T.R.A.P.